103 F.3d 545
 36 Fed.R.Serv.3d 1356, 115 Ed. Law Rep.
287, 19 A.D.D. 817
 BOARD OF EDUCATION OF COMMUNITY HIGH SCHOOL DISTRICT NO.
218, COOK COUNTY, ILLINOIS, Plaintiff-Appellant,
v.
ILLINOIS STATE BOARD OF EDUCATION, Joseph A. Spagnolo, in
his official capacity as Illinois State Superintendent of
Education, Illinois Department Of Mental Health And
Developmental Disabilities, Ann Patla, as Acting Director of
the Department of Mental Health and Developmental
Disabilities, Mr. And Mrs. B., Individually and as Parents
and Next Friends of J.B., Defendants-Appellees.
 No. 96-2320.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 31, 1996.
Decided Dec. 23, 1996.
 
 Jon G. Crawford (argued) and Andrew C. Eulass, Scariano, Kula, Ellch & Himes, Chicago, IL, for Plaintiff-Appellant.
 Susan Frederick Rhodes, Office of the Attorney General, Chicago, IL and Deborah W. Owens (argued), Hinsdale, IL, for Defendants-Appellees.
 Before POSNER, Chief Judge, FLAUM and EVANS, Circuit Judges.
 FLAUM, Circuit Judge.
 
 
 1
 This appeal is from a preliminary injunction, issued within the context of a suit brought under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq. (1996). The underlying suit involves a dispute over who is to pay for the residential education of J.B., an emotionally disturbed, sexually aggressive minor, who resides in the appellant high school district. The instant appeal concerns where J.B. is to be housed and educated pending the outcome of the school district's suit. In the spring of this year, J.B. wore out his welcome at his current residential placement. The district court placed the burden of finding a suitable substitute placement on the school district. The school district made no efforts to find a new residential school for J.B. With evident frustration, the district court judge ordered that J.B. be placed at the school district's expense in a private placement secured by his parents. The injunction invited the school district to repetition the court if an alternative appropriate facility were found. Rather than find an unobjectionable facility, the school district appealed the injunction. We affirm the district court order and sustain the preliminary injunction.
 
 I.
 
 2
 The IDEA seeks to provide all children with disabilities with "a free appropriate public education which emphasizes special education and related services to meet their unique needs." 20 U.S.C. § 1400. To assure that an educational program is tailored to the specific needs of the disabled child, the parents, teacher, and a representative of the local education agency collaborate to design an "individualized education program" (IEP) for the child. 20 U.S.C. §§ 1401(19), 1414(a)(5). The IEP, which sets forth the child's educational level, performance, and goals, is the governing document for all educational decisions concerning the child. See Rodiriecus L. and Betty H. v. Waukegan Sch. Dist. No. 60, 90 F.3d 249, 252 (7th Cir.1996). To protect the rights of the parents and child, the IDEA contains a set of procedural safe-guards, including notice to the parents and the opportunity for a hearing whenever there is a change in a child's "educational placement." 20 U.S.C. § 1415. In addition, to ensure that the educational needs of a child are met during the pendency of any proceedings conducted pursuant to the IDEA, the IDEA's "stay-put" provision mandates that the child remain in his current educational placement, unless the education agency and the parents otherwise agree. 20 U.S.C. § 1415(e)(3). See Honig v. Doe, 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988); Board of Educ. of Oak Park & River Forest High Sch. Dist. 200 v. Illinois State Bd. of Educ., 79 F.3d 654 (7th Cir.1996).
 
 
 3
 When J.B. was in grade school, his parents sought to have him placed in a residential program paid for by the state pursuant to the IDEA. During the pendency of this first hearing, the parents placed J.B. in Kid's Peace, a Pennsylvania facility specializing in treating sexually aggressive children. The hearing officer found that Kid's Peace was the appropriate facility for J.B. In June 1994, the school district worked out a financial plan with Kid's Peace, and J.B.'s parents, Kid's Peace, and the school district developed an IEP for J.B.
 
 
 4
 When J.B. reached high school age, the high school district assumed financial responsibility for him. The high school district, concerned about the cost of Kid's Peace, notified J.B.'s parents of its intention to reevaluate J.B.'s placement and IEP. The parents sought an administrative hearing and invoked the "stay-put" provision, so that J.B. could remain at Kid's Peace. Subsequently, the parents prevailed at both levels of administrative hearings, so that J.B. was able to continue at Kid's Peace. In October 1995, arguing that J.B.'s treatment is motivated by management of his psychiatric condition, rather than by his educational needs, the high school district filed suit in district court to have the burden of paying for J.B.'s treatment shifted from it to, presumably, a mental health agency.
 
 
 5
 At roughly the same time as the initiation of this suit, J.B. outgrew his current program at Kid's Peace and became eligible for a costlier Kid's Peace program. The high school district refused to pay. The parents found an alternate residential placement for J.B. at Interventions, an Illinois program. J.B. moved to Interventions. In November 1995, J.B.'s IEP was revised to incorporate Interventions, but retained the same goals as his original IEP, developed in June 1994 at Kid's Peace. In March 1996, the director of Interventions announced that J.B. was no longer welcome at his facility--J.B. posed too much of a threat to the other children. The parents pleaded for time to find J.B. another placement because keeping J.B. at home for any intervening period was not an option. Interventions agreed to keep him until May 31, 1996.
 
 
 6
 In late April 1996, the parents filed an emergency motion for a preliminary injunction in district court. They requested that the court enforce the stay-put provision and that the school district cooperate with them to find a mutually agreeable residential placement. On April 30, the court heard argument from counsel and ordered the school district to find an appropriate residential placement for J.B. Fearing that the school district was failing to act in time, the parents went ahead and applied to various programs. On May 9, the school filed a motion to reconsider the order and requested an evidentiary hearing. The court granted the school district's request for a continuance. In the mean time, the parents applied to all the placements mentioned by the school district, with the exception of those not approved by the state. On May 14, the court held another hearing and it was revealed that the school district had yet to apply for any placements. The court ordered the school district to move J.B. to Kid's Peace, which could implement J.B.'s IEP, on June 2. The court order provided that the school district could repetition if it found an alternative placement. Presumably to allow the school district an opportunity to do so, the court ordered the parties to return on the twenty-eighth. On May 28, the school district asked for an extension because it had found no other residential programs to accept J.B. The parents reported that, of all their applications, only Kid's Peace had accepted J.B. The court again ordered that J.B. be placed at Kid's Peace at the school district's expense.
 
 
 7
 The school district appeals the preliminary injunction on two grounds: (1) the district court held no evidentiary hearing before issuing the injunction; and (2) neither the reasons nor the instructions of the district court are clear enough to support its order in violation of Federal Rule of Civil Procedure 65(d). We address each of these concerns in turn.II.
 
 
 8
 The school district complains that it was entitled to an evidentiary hearing before the issue of the preliminary injunction. They argue that no evidentiary basis exists for the district court's order. In response, the parents argue that section 1415(e)(3)(a) of the IDEA, the "stay-put provision," provides for an automatic injunction, whereby neither party can alter the placement of the child during the pendency of all hearings and appeals. They reason that the court's order to place J.B. at Kid's Peace was an effort to maintain the status quo because Kid's Peace is a residential placement capable of implementing his IEP. Because the preliminary injunction was issued in conformity with the stay-put provision, no evidentiary hearing was warranted.
 
 
 9
 We first inquire whether the injunction was issued pursuant to the stay-put provision. Concluding that the injunction was an effort to maintain the status quo, and thus within the purview of the stay-put provision, we next ask whether an injunction issued pursuant to the stay-put provision warrants an evidentiary hearing.
 
 A.
 
 10
 The stay-put provision mandates that a child remain in his same educational placement pending the outcome of any proceedings brought pursuant to section 1415, unless the parents and the school district otherwise agree. The appellant school district has filed suit, in part, under section 1415. Thus, the instant preliminary injunction is authorized by the statute if it allows J.B. to remain in his same "educational placement." Unfortunately, the term "educational placement" is not statutorily defined, so that identifying a change in this placement is something of an inexact science.
 
 
 11
 Under IDEA case law developed by other circuits, the meaning of "educational placement" falls somewhere between the physical school attended by a child and the abstract goals of a child's IEP. The Second Circuit gave content to the term in Concerned Parents & Citizens for the Continuing Education at Malcolm X v. The New York City Board of Education, 629 F.2d 751 (2d Cir.1980), a case in which 185 disabled children were moved to a less "innovative" school when their school closed for budgetary reasons. Reviewing the legislative history of the act, whose primary concern was the accurate classification of children as disabled, and the regulations, which use the term "placement" to refer to general educational programs, the court suggested that the recognition of a change in "placement" was limited to "certain fundamental decisions regarding ... the most appropriate type of educational program for assisting a child ... with a handicap." Id. at 753-54. In contexts where children are moved from a school because of external factors, rather than their own behavioral problems, courts seem to have followed the Second Circuit's lead. See Weil v. Bd. of Elementary & Secondary Educ., 931 F.2d 1069, 1072 (5th Cir.1991) (collecting cases interpreting placement as general educational program);[1] Tilton v. Jefferson County Bd. of Educ., 705 F.2d 800 (6th Cir.1983) (holding educational placement to be amalgam of academic instruction and treatment). In instances where a child has been expelled, courts have construed "educational placement" much more narrowly by looking to the specific institution. For example, in Kaelin v. Grubbs, 682 F.2d 595 (6th Cir.1982), the Sixth Circuit held that the expulsion of a disabled child was a change in placement. Id. at 602. Focused not on the intrinsic meaning of "educational placement," but on the context in which the case arose, the court reasoned that the behavior that triggered the expulsion could have been caused by the child's disability, therefore the procedural protections of the IDEA, rather than the disciplinary measures of the school, were warranted. Id. See Sch. Bd. of the County of Prince William, Virginia v. Malone, 762 F.2d 1210 (4th Cir.1985) (expulsion reflects change in placement).
 
 
 12
 This abbreviated survey suggests that while the jurisprudence in this area has been driven by the facts of each case, our approach need not be unguided. Generally speaking, where expulsion is at issue, a change of school is interpreted as a change in placement. This narrow reading of placement is in keeping with original purpose of the Education of the Handicapped Act: Congress passed the act to prohibit schools from excluding from the classroom difficult disabled students. Honig, 484 U.S. at 309-10, 108 S.Ct. at 596-97. Where fiscal concerns cause a student to be transferred, the courts focus not on the school, but on the child's general educational program. This looser interpretation of placement is appropriate because the concern is not whether the school is attempting to rid itself of a disabled child or that a disabled student has been placed in an inappropriate school.
 
 
 13
 In the instant case, we are presented with variations on both of these scenarios. J.B. has been expelled, but the parents do not challenge the expulsion. The school board, rather than allowed to redirect J.B.'s placement, as it commonly does when the old school has become an impossibility, has forfeited the right to do so. What is challenged is the power of the court and the parents, rather than the power of the school district, to effect J.B.'s placement.
 
 
 14
 Hesitant to definitively establish the meaning of "educational placement" for our circuit, we adopt our sister circuits' fact-driven approach. We accept as the outer parameters of "educational placement" that it means something more than the actual school attended by the child and something less than the child's ultimate educational goals. Because we are not concerned about Intervention's expulsion or that J.B. and his IEP are mis-matched, we opt for a looser interpretation of "educational placement" and recognize within the term enough room to encompass J.B.'s experience.
 
 
 15
 At the outset of the proceedings leading up to suit in district court, J.B. was enrolled at Kid's Peace, which was implementing an IEP developed in June 1994. It was at this point that the parents invoked the stay-put provision to freeze J.B.'s "educational placement." However, within a month, because of the increase in the cost of Kid's Peace, the parents agreed to move J.B. to Interventions. A new IEP was drawn up, which incorporated the exact goals of the Kid's Peace IEP, to be implemented at Interventions. Six months later, J.B. was, in effect, expelled from Interventions. The court ordered that J.B. return to Kid's Peace. However, because of his age, he returned to a different program than he was in when his educational placement was frozen.
 
 
 16
 These successive transfers between the three programs reflect an attempt to adhere to the educational status quo for a growing, learning, and disturbed teenager, and thus do not reflect a change in educational placement. We do not know the qualitative distinctions that can be made between the original Kid's Peace program, the Interventions program, and the current Kid's Peace program. We assume they are many. Given J.B.'s progress in school, coupled with his behavioral problems, maintaining a static educational experience is an impossibility. Still obliged to effect the stay-put provisions and preserve an "educational placement," we move one level of abstraction to J.B.'s IEP, which establishes J.B.'s educational needs and goals. All three programs are able to implement a substantively identical IEP. Due to this consistency, we conclude that the district court injunction effected the stay-put provisions. We note additionally that the school district did not offer any suggestion as to how J.B.'s educational placement could be better maintained during the pendency of this litigation.
 
 B.
 
 17
 We proceed to inquire whether an injunction issued pursuant to the stay-put provision warrants an evidentiary hearing. This court has suggested that the stay-put provision might qualify as a statutory injunction. Bd. of Educ. of Oak Park & River Forest High Sch. Dist. 200 v. Illinois State Bd. of Educ., 79 F.3d 654, 657 (7th Cir.1996). More recently, we have treated an order under the stay-put provision as a preliminary injunction and required the balancing of four equitable factors.[2] See Rodiriecus L. and Betty H. v. Waukegan Sch. Dist. No. 60, 90 F.3d 249, 254 (7th Cir.1996).
 
 
 18
 Rodiriecus was an appeal from an injunction under the stay-put provision where the child had yet to be identified as a disabled student. Reasoning that a reflexive injunction in this instance would allow any expelled child to stay the hand of the school pending a hearing under the IDEA, the court wrote: "In such cases, we believe it is wise ... to look at the traditional factors (in light of scientific or psychological reports and teacher evaluations) in deciding whether or not to grant a preliminary injunction." Id.
 
 
 19
 J.B.'s is not such a case. J.B. has been identified by four administrative bodies as disabled. He is in possession of an IEP, which tailors an educational program to his needs. The equitable balancing reserved for preliminary injunctions has no place in this context. Rodiriecus was a fact-driven case. As evidenced in our language, we reserved some room to adjust our approach to the stay-put provision. If we were, in the instant case, to import these equitable factors into the stay-put provision, we would dilute the statutory framework. J.B. has been deemed eligible for assistance under the IDEA; the statute guarantees that he and his parents be able to rely on an uninterrupted education during a contest between the school board and the parents.
 
 
 20
 This is not to say that an evidentiary hearing has no place under the stay-put provision. If there are contested facts or no facts, an evidentiary hearing is, of course, warranted. In this instance, the court had an evidentiary record on which to ground the issue of the injunction: transcripts of the two administrative hearings, which resulted in a placement at Kid's Peace, and J.B.'s current IEP. Any facts bearing on what a better placement for J.B. would be could be aired at an evidentiary hearing. Of course, because of the school district's failure to produce any placement alternatives, the district court had no other schools to evaluate or weigh against Kid's Peace, and thus no hearing was necessary.
 
 
 21
 Appellant asserts that there are facts in dispute: at root, whether J.B.'s treatment is motivated by his disability or his education. This inquiry is the gravamen of its complaint as well. We reject this question as irrelevant to a determination under the stay-put provisions. Appellant may not bootstrap this underlying dispute over funding into this highly time-sensitive determination of where the child is to reside while the trial is prepared. Until the cost shifting is decided at trial or through settlement, the school district is financially responsible for J.B.'s education. Appellant will soon be able to flesh out this dispute at trial.
 
 III.
 
 22
 With little support for its position, the school district argues that the district court's order fails to comply with Federal Rule of Civil Procedure 65(d). Rule 65(d) requires that every order granting an injunction set forth the reasons for its issuance and describe in reasonable detail the acts required. While not over-burdened with reasons, the minute order states, "plaintiff school district shall maintain the status quo." Maintaining the status quo is reason enough. The order goes on to state specifically that the school district must implement J.B.'s IEP at Kid's Peace, and that it must make flight arrangements, contracts, and payments to enroll J.B. The order allows the school district to repetition the court if it discovers a better facility for J.B. The order requires the parents to provide cover letters and releases for future applications to residential facilities. These instructions are sufficient. Neither party is left in the dark as to why the injunction is issuing or as to what must be done. In fact, this order was drafted jointly by the parties.
 
 
 23
 For the foregoing reasons, we AFFIRM the injunction of the district court.
 
 
 
 [1]
 In Weil, the court also held that the stay-put provision does not apply where the change of placement is beyond the control of the public educational agency, 931 F.2d at 1073, which is the case with J.B.'s change of placement. Because appellant does not make this argument, we do not address this issue
 
 
 [2]
 The four factors are the following: (1) the movant's likeliness of success on the merits; (2) the irreparability of harm to the moving party if the injunction does not issue; (3) whether the harm to the movant outweighs harm to the non-movant; and (4) the public interest. Rodiriecus, 90 F.3d at 254