In the

# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 06-3274 & 06-3738

JOHN M., by his parents and next
friends, CHRISTINE M., and MICHAEL M.,

*Plaintiffs-Appellees,*

*v.*

BOARD OF EDUCATION OF EVANSTON
TOWNSHIP HIGH SCHOOL DISTRICT 202,
EVANSTON TOWNSHIP HIGH SCHOOL
DISTRICT 202, and ALLAN ALSON,

*Defendants-Appellant*s.

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 6720—**James F. Holderman**, *Chief Judge.*

_____

ARGUED FEBRUARY 8, 2007—DECIDED SEPTEMBER 17, 2007

_____

Before RIPPLE, MANION and WILLIAMS, *Circuit Judges.*

RIPPLE, *Circuit Judge.*  John M. ("John"), by and through
his parents and next friends, Christine M. and Michael M.,
filed this action seeking relief under the Individuals with
Disabilities in Education Act ("IDEA"), as amended by
the Individuals with Disabilities in Education Improve-
ment Act ("IDEIA"). He alleged that Evanston Township

High School District 202, its Board of Education and its Superintendent (collectively "the School District") had denied John a free, appropriate public education ("FAPE") as required by the legislation. In response to John's motion for enforcement of the statute's "stay-put" provision, which requires generally that a child remain in the same educational placement pending any proceedings, *see* 20 U.S.C. § 1415(j), the district court entered a preliminary injunction.

For the reasons set forth in this opinion, we have concluded that the injunction cannot stand in its present form because it addresses matters beyond the stay-put provision and does not apply the correct standards when it does address the stay-put provision. Accordingly, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.[1]

# I

## BACKGROUND

### A.

John is a 16 year-old sophomore in high school who has Down's Syndrome. He is enrolled in the School District as a student at Evanston Township High School ("ETHS"), a public school that receives federal funding and that is subject, therefore, to the requirements of the

---

[1] At the invitation of the court, the United States Secretary of Education submitted a brief as amicus curiae. We express our appreciation to the Secretary for her helpful assistance.

IDEA and the IDEIA. Before beginning his high school career at ETHS, John had attended Haven Middle School, District 65 ("Haven"). Students from Haven normally transition to ETHS to continue their education.

While John was a student at Haven, he pursued his middle school education under the terms of an Individualized Education Program ("IEP"). This plan, often referred to in this opinion as the "May 2004 IEP," had been formulated in May 2004. While at Haven, John had received a service that the parties refer to as "co-teaching." The phrase "co-teaching" did not appear in the May 2004 IEP.

In Spring 2005, John's parents and representatives of ETHS met to formulate an IEP for John's coming freshman year at ETHS.[2] Representatives from Haven also attended the first two sessions of these meetings. During

---

[2] The IDEA requires a cooperative process in which a family and a school agree upon a child's educational placement. *See, e.g.*, *Patricia P. v. Bd. of Educ. of Oak Park*, 203 F.3d 462, 469 (7th Cir. 2000) ("[A] school district is . . . bound by the IDEA's preference for a cooperative placement process: this Court will look harshly upon any party's failure to reasonably cooperate with another's diligent execution of their rights and obligations under the IDEA."). Indeed, the IDEA requires an "IEP Team," composed of the parents of the child with the disability, not fewer than one of the child's regular education teachers if the child is or may be participating in the regular educational environment, not fewer than one special education teacher, a representative of the local educational agency, an individual qualified to interpret the instructional implications of evaluation results, others who, at the discretion of the parents or the agency, may be determined to have special expertise and, whenever appropriate, the child with a disability. 20 U.S.C. § 1414(d).

this process, ETHS stated that it would not be able to provide the same sort of co-teaching services that Haven had provided to John during his middle school education. Instead, ETHS proposed to afford John 215 minutes per week of special education services. The proposed ETHS IEP also provided that John's special education teacher would *observe* him in his general education classes of English, History, Algebra and Biology for 43 to 86 additional minutes per week. ETHS' IEP also provided for various speech therapy services, social work services, physical therapy and occupational therapy. It did not provide, however, for a "Circle of Friends" type social and speech therapy that John had received at Haven and that his parents believed was very beneficial to him during his time there.

Because John's parents did not believe that the proposed IEP fulfilled the School District's statutory responsibility to their son, they requested an administrative hearing. The hearing officer determined that the IEP complied with statutory requirements. He also concluded that ETHS had complied fully with the requirements of the stay-put placement.[3]

John then filed an action in the district court seeking review of the hearing officer's determination. While this action was pending, John filed a motion for a preliminary injunction to enforce the stay-put placement and a motion to supplement the administrative record and

---

[3] John has appealed to the district court the hearing officer's conclusions as to whether the School District's proposed IEP affords John a free, appropriate public education ("FAPE"). That appeal is still pending before the district court.

present additional evidence.[4]

**B.**

In his motion for a preliminary injunction, John sought to maintain the status quo, the May 2004 middle school IEP, while the litigation over the proposed high school IEP was under consideration by the district court.

Although ostensibly ruling on the stay-put request, the district court addressed extensively the merits of the proposed high school IEP and determined that the School District, as a practical matter, offered only two options to John: (1) a mainstream class without a co-teacher or (2) placement in a separate special education classroom. The district court then concluded that the School District essentially had defaulted John into the special education class because his disability prevented him from participating in the mainstream classes. The district court held that this situation was a violation of the statute because it denied John an individual assessment. The district court, therefore, vacated the hearing officer's decision to the extent that it was inconsistent with the district court's determination that the proposed high school IEP did not offer John a FAPE. The district court then entered a preliminary injunction that required the School District to provide John with an education based on its proposed high school IEP with additional features specified by the court.[5]

---

[4] The motion to supplement the administrative record is not before us on this appeal.

[5] The district court's order is set out as an appendix to this decision.

The School District then filed a motion to stay the district court's judgment pending appeal. *See* Fed. R. Civ. P. 62(c). The district court granted the motion in part and denied it in part. The district court agreed with the School District that the part of its order that required the plaintiffs and defendants to work together to create a new IEP crossed the line from enforcement of the stay-put placement to a merits-based preliminary injunction. It therefore stayed subsection 3 of its order, but denied the stay with respect to the remainder of the order.

## II

## DISCUSSION

### A.

John first submits that the district court erred when, while ruling on his motion for a preliminary injunction to enforce the statute's stay-put provision, it vacated, sua sponte, the hearing officer's decision on the merits.

After John appealed the merits of the hearing officer's decision to the district court, he filed a motion for a preliminary injunction to enforce the stay-put provision of the statute. In ruling on John's motion for preliminary injunction on the stay-put placement, the district court, sua sponte, vacated the decision of the hearing officer and ordered the implementation of a regimen that employed the proposed high school IEP as its base and added other requirements, including a co-teaching services component. The School District submits that the district court exceeded the bounds of the motion and, by addressing the underlying merits, deprived the School District of the right to be heard.

The School District is correct. The motion for a preliminary injunction to enforce the stay-put provision had not placed the merits of the hearing officer's decision before the district court. In asking for preliminary injunctive relief, John sought to enforce only the stay-put placement provision of the statute while he litigated, in the district court, the correctness of the hearing officer's decision. Upon the filing of the motion for a preliminary injunction, the School District simply was not on notice that the district court planned to address, in its consideration of that motion, the underlying merits. Consequently, the School District did not have an adequate opportunity to submit evidence with respect to the appropriateness of the proposed high school IEP. The School District simply was not given an adequate opportunity to defend itself on the merits. Accordingly, we must conclude that it was error for the district court to amend sua sponte the IEP and to vacate the hearing officer's decision.

Our determination is simply an application of the general rule that sua sponte judgments are generally disfavored. *See Southern Illinois Riverboat Casino Cruises, Inc. v. Triangle Insulation & Sheet Metal Co.*, 302 F.3d 667, 677-78 (7th Cir. 2002). At a minimum, sua sponte judgments are proper only when the litigants have proper notice that the district court is contemplating entering such a judgment and have a fair opportunity to submit evidence prior to the entry of such a judgment. *Sims-Madison v. Inland Paperboard & Packaging, Inc.*, 379 F.3d 445, 449 (7th Cir. 2004).

### B.

We now must examine whether the district court erred when it held that co-teaching was required as part of John's stay-put placement.

In enacting the stay-put provision, Congress intended "to strip schools of the *unilateral* authority they had traditionally employed to exclude disabled students . . . from school." *Honig v. Doe*, 484 U.S. 305, 323 (1988) (emphasis in original). The statute's stay-put provision requires that a child remain in "the same educational placement pending the outcome of any proceedings brought pursuant to section 1415, unless the parents and the school district otherwise agree." *Bd. of Educ. of Cmty. High Sch. Dist. No. 218 v. Illinois State Bd. of Educ.*, 103 F.3d 545, 548 (7th Cir. 1996). The term " 'educational placement' is not statutorily defined, so that identifying a change in this placement is something of an inexact science." *Id*. Indeed, we have admitted to a hesitancy to establish in any definitive and rigid way the meaning of "educational placement." Rather, we have seen wisdom in, and therefore have adopted, the fact-driven approach employed by our sister circuits. *Id.* at 549. In *Board of Education of Community High School District No. 218 v. Illinois State Board of Education*, 103 F.3d 545 (7th Cir. 1996), we recognized that within the term there must be "enough room to encompass [the child's] experience." *Id.* We recognized that the educational status quo for a "growing, learning" young person often makes rigid adherence to particular educational methodologies "an impossibility." *Id*. Under these circumstances, respect for the *purpose* of the stay-put provision requires that the former IEP be read at a level of generality that focuses on the child's "educational needs and goals." *Id*.

As we pointed out in *High School District No. 218*, our colleagues in the Second Circuit have interpreted "educational placement" along the same lines. They have described it to refer to "the general educational program

in which a child who is correctly identified as handicapped is enrolled, rather than mere variations in the program itself." *Concerned Parents & Citizens for the Continuing Educ. at Malcolm X (PS 79) v. New York City Bd. of Educ.*, 629 F.2d 751, 754 (2d Cir. 1980). In a similar vein, the court noted that, the regulations implementing the IDEA also interpret the term "placement" to mean "only the general program of education." *Id.* By contrast, the judges likened a change in "educational placement" to involve moving a child from a "special class in a regular school to a special school." *Id.* A more rigid interpretation of "educational placement," the court pointed out, would impede the school board's ability to make "even minor discretionary changes within the educational programs provided for its students." *Id.* at 755.[6]

This perspective is shared as well by our colleagues in the Ninth Circuit. They have stated, in *Johnson ex rel. Johnson v. Special Education Hearing Office*, 287 F.3d 1176 (9th Cir. 2002), that all "educational placement" requires is "comparable placement." *Id.* at 1182. In *Ms. S ex rel. G. Vashon Island School District*, 337 F.3d 1115 (9th Cir. 2003) (superseded by statute on other grounds), the court spoke directly to the situation before us—the progression of a child from one level of education to another. When a child progresses from preschool to elementary school,

---

[6] Similarly, in *Casey K. ex rel. Norman K. v. St. Anne Community High School Dist. No. 302*, 400 F.3d 508 (7th Cir. 2005), we held that removing a child from a private school and enrolling him in a public school with "completely different teachers, curriculum, and classmates" did not comply with the automatic statutory injunction established by the stay-put provision. *Id.* at 513.

from elementary school to middle school or from middle school to high school, the "status quo no longer exists." *Id.* at 1133. Under these circumstances, the obligation of the new district is to provide educational services that approximate the student's old IEP as closely as possible. *Id.* at 1134.

We believe that these cases recognize the need for *some* degree of flexibility in interpreting the last agreed-upon IEP in a stay-put situation. In complying with the stay-put provision, we must interpret "educational placement" to incorporate enough flexibility to "encompass [the child's] experience*." High Sch. Dist. No. 218*, 103 F.3d at 549. A child's interim educational regime must produce as closely as possible the overall educational experience enjoyed by the child under his previous IEP. To achieve that result, we must recognize that educational methodologies, appropriate and even necessary in one educational environment, are not always effective in another time and place in serving a child's continuing educational needs and goals.

Nevertheless, when asked to approve an alteration in educational methodology in a stay-put order, we must give careful attention to the purpose of the stay-put provision. The recognized and defined special needs of the child and the educational goals originally set by the parents and by professional educators must be respected. Protestations that educational methodologies proven to be helpful to the child in the past are now impossible must be evaluated with a critical eye to ensure that motivations other than those compatible with the statute, such as bureaucratic inertia, are not driving the decision. Suggestions for methodological change that would dilute the statute's policy of "mainstreaming" disabled chil-

dren to the "maximum extent appropriate," 20 U.S.C. § 1412(a)(5)(A), deserve particular scrutiny. *See Casey K. ex rel. Norman K. v. St. Anne Comty. High Sch. Dist. No. 302*, 400 F.3d 508, 512 (7th Cir. 2005). The "removal of children with disabilities from the regular educational environment occurs *only* when the nature or the severity of the disability of a child is such that education in regular classes with the use of supplementary aid and service cannot be achieved satisfactorily." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 202 n.24 (1982) (internal citations and quotation marks omitted).

## C.

On remand, the district court must revisit the request for interim injunctive relief under the stay-put provision. Its starting point must be the May 2004 IEP that governed John's middle school education. This document, as the last educational plan agreed upon by the parents and the professional educators, is the appropriate basis for stay-put relief. Generally, the terms of this IEP should be enforced, without exception, as the stay-put relief.

In examining the May 2004 IEP, the district court must note with particular care the precise requirements of the IEP. Even if a school has provided a particular service in the past, it need not be provided in a stay-put situation if it was not within the governing IEP. *See Cordrey v. Eukert*, 917 F.2d 1460, 1468 (6th Cir. 1990); *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1313-14 (9th Cir. 1987). If the parties dispute what the IEP requires, as they do here with respect to co-teaching, the court must evaluate the IEP as a whole and determine whether such a methodology is required under the terms of the IEP. Under

usual circumstances, the court should find it unnecessary to go beyond the four corners of the document in order to make that determination. However, vagueness in the instrument with respect to how its goals are to be achieved may require that the court turn to extrinsic evidence to determine the intent of those who formulated the plan. *See Doe v. Defendant I*, 898 F.2d 1186, 1190 (6th Cir. 1990) (noting that it would "exalt form over substance" to ignore information known to parents and administrators simply because it was not contained in the four corners of the IEP). A methodology not mentioned in the plan may well indicate that those who formulated the plan did not consider that particular methodology a necessary component to the plan—although they well may have intended that some comparable methodology be implemented. *See Erickson v. Albuquerque Pub. Schs.*, 199 F.3d 1116, 1121-22 (10th Cir. 1999) (holding that, when IEP simply required occupational therapy, the substitution of one type of occupational therapy for another was permissible). Here, the term "co-teaching" is not mentioned in the May 2004 IEP itself. Therefore, the district court ought to determine, after evaluating the entire May 2004 IEP as a totality, whether the parties regarded this methodology as an essential part of the plan or as simply one of several ways by which the plan could be implemented. As we noted earlier, in answering this question, the court will need to explore *precisely* how the plan was implemented at Haven. The exact method of implementation is not apparent on this record and the accounts of the parties are not compatible.

Knowledge of precisely how this feature of the plan was implemented at Haven is important for another reason. In examining the manner in which the plan was

implemented in the middle school environment, the district court will be able to gauge far more accurately the School District's claim that implementation of that methodology in the institutional setting of a high school is not possible. As we have said earlier, *if* the district court finds that the methodology employed in the middle school is actually part of the May 2004 IEP, the court must require very compelling evidence from the School District before permitting a deviation from the course already set. However, the court might determine nevertheless that the high school setting makes the use of such an approach counterproductive in terms of the goals of the IEP or impossible to implement. The court then may allow the parties to propose an alternative. This alternative should be as close as possible to the approach used in the middle school but nevertheless compatible with the goals of the IEP and the institutional demands of the high school setting. On the other hand, if the court determines that the methodology is not part of the IEP but simply a methodology chosen by the middle school educational professionals, that particular methodology need not be included in the stay-put order. The district court should then permit the high school authorities to choose the approach that they believe will be most effective in the implementation of the IEP.

The district court must address another matter. The district court took the view that the School District had waived the argument that it would be impossible to implement, in the new high school environment, the concept of co-teaching. The district court found that the School District had waived any impossibility argument when it agreed, before the hearing officer, to implement the May 2004 IEP. We do not believe that the record can

support that finding. In its briefs before the district court, the School District did state explicitly that it would be "impossible" to provide co-teaching services to John due to the differing course and curriculum arrangements at the high school. It is also true that the School District agreed to implement John's May 2004 middle school IEP during the stay-put period. We believe, however, that given the School District's explicit statement about co-teaching services, which are not mentioned explicitly in the document, we must interpret its willingness to implement the May 2004 middle school IEP as a statement that it is willing to read the IEP as the School District maintains that it should be read—without the co-teaching service. The School District had agreed to implement the four corners of the last agreed-upon IEP as required under the IDEA, but also had mentioned explicitly the impossibility of providing co-teaching services, a service it maintains is not part of the May 2004 middle school IEP. Under these circumstances, we cannot sustain a finding that the School District has waived any impossibility argument.

## Conclusion

For the foregoing reasons, the judgment of the district court is reversed and the case is remanded for proceedings consistent with this opinion. The School District may recover its costs on this appeal.

REVERSED and REMANDED

**Appendix**

Plaintiff John M.'s motion of March 28, 2006 to supplement to administrative record and present additional evidence (Dkt. No. 21) is granted. John M.'s motion of March 28, 2006 for preliminary injunction and to enforce the stay put placement (Dkt. No. 19) is granted to extent that this court orders the vacating of the hearing officer's decision.

Until the parties can agree to a proper IEP for John in compliance with the IDEA, the court orders the following preliminary injunction:

(1) ETHS is ordered to provide education to John that it previously promised to provide under the prior IEP as proposed by ETHS, if so desired by John's parents. The prior IEP shall serve as a baseline with the following additions as set forth below in section (2).

(2) ETHS is ordered to provide the following additions to the baseline IEP, if John's parents so desire:

(a) ETHS shall create a proposed schedule for John that will be used should John be placed in regular non-special education classes including the classes of English, History, Mathematics and Science. ETHS shall also designate responsible teachers in these regular education classes who shall communicate their lesson plans and other relevant material to John's special education teachers so that John shall receive as much regular class education as possible until the issue of John's placement into regular classes can be determined by the parties and this court. John's special education teachers shall attempt to utilize, where possible, all available textbooks, equipment and other applicable materials that are used in the instruction of non-disabled students in regular classes. ETHS shall

provide John's parents written copies of the materials provided by the regular class teachers to the special education teacher and the lesson plans used by the special education teachers. These written reports to John's parents shall be made on weekly basis unless another schedule is agreed to by ETHS and John's parents.

(b) ETHS shall provide John with a minimum of 800 minutes per week of special education instruction in compliance with the instructions in subsection (a) unless a lesser amount of time is otherwise agreed to by John's parents.

(c) ETHS shall provide John with 120 minutes per week of social work services and 120 minutes per week of speech therapy unless a lesser amount of time is otherwise agreed to by John's parents. The social worker and speech therapist shall strive to work with John in social settings and otherwise attempt to integrate John into the non-disabled community in ETHS in the spirit of the "Circle of Friends" program.

(d) ETHS shall allow John to participate in any ETHS activity, intramural sports, club or extra-curricular program available to non-disabled students unless ETHS can articulate a valid, non-discriminatory reasoning for John's exclusion.

(e) ETHS is ordered to place John in a regular physical education class if John's parents so desire unless ETHS as able to articulate a valid, non-discriminatory reason for John's exclusion.

(f) ETHS cannot exclude John from any resource, such as the resource room, that is available to any other ETHS student, both disabled and non-disabled.

(3) ETHS is ordered to meet with John's parents, and any other individual that John's parents designate, to work in good faith to create a new IEP for John in order to determine the free, appropriate public education in the least restrictive environment for John at ETHS. This IEP shall be based on an individual assessment of John in accordance with the requirements of IDEA. The IEP shall determine, at a minimum:

(a) John's placement in either special education or regular education classes.

(b) Resources to be made available to John at ETHS, including teachers, therapists, computers, textbooks and equipment. ETHS must state the number of minutes that each resource will be devoted to John's education.

(c) The parties' positions on a "Circle of Friends" type program for John.

(d) Processes in place to integrate John, to the extent desired by John and within the limitations of the circumstances, into the community of both disabled and non-disabled students at ETHS.

(4) ETHS and John's parents shall confer in good faith as to the exchange of information and other discovery as to John's progress. ETHS shall make its educators, staff and other appropriate material available to John's parents, and John's parents' representatives, during the discussion of the proposed IEP. Additionally, John's parents, their attorney, and their proposed expert Dr. Schwarz, shall be permitted to observe John's treatment at ETHS.

The parties are to complete their proposed IEP by no later than September 15, 2006. The proposed IEP and

supporting evidence shall be submitted to this court, with accompanying briefs by no later than September 29, 2006 Cross responses are due by October 13, 2006. This case is set for a report on status on October 24, 2006 at 9:00 a.m.

R.34 at 11-14.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*