**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

SUMTER COUNTY SCHOOL DISTRICT
17,

*Plaintiff-Appellant,*

v.

JOSEPH HEFFERNAN, on behalf of
his son TH; MAY BAIRD, on behalf
of her son TH,

*Defendants-Appellees.*

No. 09-1921

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Joseph F. Anderson, Jr., District Judge.
(3:07-cv-01357-JFA)

Argued: December 8, 2010

Decided: April 27, 2011

Before TRAXLER, Chief Judge, WYNN, Circuit Judge,
and David A. FABER, Senior United States District Judge
for the Southern District of West Virginia,
sitting by designation.

Affirmed by published opinion. Chief Judge Traxler wrote the
majority opinion, in which Senior Judge Faber joined. Judge
Wynn wrote an opinion concurring in part and dissenting in
part.

**COUNSEL**

**ARGUED:** David Thomas Duff, DUFF, WHITE & TUR-NER, LLC, Columbia, South Carolina, for Appellant. Erik T. Norton, NELSON MULLINS RILEY & SCARBOROUGH, LLP, Columbia, South Carolina, for Appellees. **ON BRIEF:** Meredith L. Seibert, DUFF, WHITE & TURNER, LLC, Columbia, South Carolina, for Appellant. Matt Bogan, NELSON MULLINS RILEY & SCARBOROUGH, LLP, Columbia, South Carolina, for Appellees.

---

**OPINION**

TRAXLER, Chief Judge:

In this action under the Individuals with Disabilities Education Act (the "IDEA"), Sumter County School District #17 (the "District") appeals from the district court's order finding that the District had failed to provide a free and appropriate public education to T.H. and that the program established by T.H.'s parents to educate him at home was appropriate. For the reasons set forth below, we affirm.

I.

T.H. falls on the moderate-to-severe end of the autism spectrum. He is functionally non-verbal, in that he does not often use language spontaneously, and he is very sensitive to noise. When this action was commenced, T.H. attended Bates Middle School in Sumter County, South Carolina. His individual education plan ("IEP") for the 2005-06 school year called for 15 hours per week of applied behavioral analysis ("ABA") therapy; the IEP for the 2006-07 school year called for 27.5 hours per week of ABA therapy.

In the fall of 2005, the District was providing T.H. with approximately 7.5-10 hours per week of ABA therapy instead

of the 15 hours required by the IEP. T.H. did not do well that fall, and he began exhibiting problematic "self-stimulating" behavior, such as biting himself (or others) and wiping his nose and face so much that his nose bled and his skin chafed. T.H. also began to wet his pants several times a day while at school.

The parents removed T.H. from school in December 2005 for a medical treatment. By the time he returned to school in January 2006, the District had hired Cassandra Painter, a board-certified ABA therapist, to work in the autism classroom along with the lead teacher and the other aides. Painter immediately made some changes in the District's approach to teaching T.H., and the problematic behaviors began to subside. The lead teacher resigned in March 2006, and Painter became the lead teacher of the autism classroom.

Painter testified at the due process hearing that she believed T.H.'s problems during the 2005-06 school year were largely caused by improper teaching techniques that had been used before she arrived. She testified that the lead teacher and the aides "didn't have a very good understanding of the terminology, of the techniques that are used in applied behavior therapy." J.A. 364. Painter testified that when she arrived, T.H. "was very aversive to the teaching situation. He would not sit for more than a second or two without someone physically prompting him to . . . be there. He was not able to retain information that we had taught him." J.A. 366. Painter believed that if proper ABA techniques had been used in the fall of 2005, T.H. would have "been able to sit and work. It would have, should have been a situation where he was a willing learner." J.A. 367. She testified that she spent a considerable portion of her time in the spring of 2006 correcting the problems that had been caused by improper teaching techniques. *See* J.A. 367. With Painter's efforts, T.H. by July 2006 had progressed to the point where he would sit and work with Painter for 20 minutes at a time.

In August 2006, Painter took a position with a different school, and the District hired Sharon James as lead teacher for the autism class. James was a certified special education teacher and the mother of an autistic child, but she had never been trained in ABA therapy. T.H. did not do well under James. James had limited ability to control T.H.'s behavior—she testified that he was out of his chair and running around the classroom about 50% of the time—and T.H.'s problematic behaviors (wiping his face, wetting his pants) returned.

The District hired ABS, Inc., an educational consulting company, to provide ABA training and continuing supervision for James and the classroom aides. ABS provided a three-day training seminar for James and the classroom aides on September 13-15, 2006, more than a month after the school year had begun. After the training session had been completed, an ABS consultant observing the classroom believed that James was verbally and physically abusing the students and that James was actively resistant to the ABA approach. The consultant reported her observations to her supervisor, who in turn reported the problems to the District. Although the District investigated the matter, it could not substantiate the allegations of abuse and did not fire James. ABS then terminated its contract with the District, concluding that the District had, in essence, determined that its consultant had lied about James.

On September 26, 2006, shortly after ABS terminated its contract with the District, the parents removed T.H. from Bates. The parents then brought in Painter, T.H.'s former teacher, to conduct an assessment. Painter concluded that T.H. had regressed from where he had been in July, when she last worked with him, and she found that he had again become aversive to teaching. For T.H.'s education the parents hired an experienced ABA "line therapist" to provide approximately 30 hours per week of ABA therapy to T.H. in the parents' home.

The parents thereafter initiated due process proceedings, seeking a determination that the District was not providing T.H. with the "free appropriate public education" ("FAPE") required by the IDEA. After conducting an evidentiary hearing, the first-line local hearing officer ("LHO") issued an opinion concluding that, in light of the District's failure to provide all of the ABA therapy required by the IEPs, the parents were entitled to some level of compensatory educational services from the District. The LHO, however, determined that the home placement was not appropriate because it did not provide the least restrictive environment for T.H.

The parents appealed to a state review officer ("SRO"). The SRO expressed some uncertainty about whether the LHO had actually concluded that the District denied T.H. a FAPE, but, after reviewing all of the evidence, the SRO ultimately determined that the District had not provided T.H. with a FAPE. As to the appropriateness of the home placement, the SRO explained that the IDEA's least-restrictive-environment requirement does not strictly apply to private placements and that the overriding issue was whether the home placement was "reasonably calculated to enable the child to receive educational benefits." J.A. 807. The SRO concluded that the home placement was appropriate, given that it provided proper ABA therapy to T.H.; that T.H. had made educational progress in the home placement; and that the parents and the therapist made sure T.H. had regular opportunities to interact with other children. Because it was not entirely clear whether the parents were seeking reimbursement for the expenses associated with the home placement or whether the approval of the home placement would affect the need for any compensatory educational services, the SRO remanded the case to the LHO for additional proceedings related to the remedy.

The District then initiated this action in federal district court challenging the SRO's decision. The district court expressed general agreement with the factual findings of the LHO, but determined that the LHO's legal conclusions "do

not logically flow from his factual findings, and therefore are not entitled to deference." J.A. 39. Agreeing with the SRO's analysis, the district court concluded that the District had denied T.H. a FAPE and that the home placement was appropriate. This appeal followed.

In the proceedings below, the District contended that it had provided T.H. with a FAPE in both the 2005-06 and the 2006-07 school years. On appeal, however, the District now concedes that, in light of the issues that arose after Painter resigned as lead teacher shortly before school started, it *did not* provide T.H. with a FAPE for part of the 2006-07 school year. The District contends, however, that by the time of the administrative hearing in December 2006, it had remedied all of the problems in the autism classroom. The District therefore concedes only that it denied T.H. a FAPE from the beginning of the 2006 school year through December 6, 2006, the date of the due process hearing. Accordingly, the District in this appeal raises two issues related to its obligation to provide a FAPE. It contends that the district court erred by concluding that the District failed to provide T.H. a FAPE during the 2005-06 school year, and that the district court failed to recognize that the District had remedied all of the problems by the time of the due process hearing and was at that time capable of providing T.H. with a FAPE. The District also argues that the district court erred by concluding that T.H.'s home placement was appropriate.

## II.

## A.

The District first contends that the district court erred by concluding that it failed to provide T.H. with a FAPE for the 2005-06 school year. Although the District acknowledges that it did not provide T.H. with all of the hours of ABA therapy required by the IEP, the District insists that it delivered significant portions of the services required by the IEP that pro-

vided some educational benefit to T.H., which is sufficient under the IDEA.

The IDEA requires states receiving federal funds for education to provide disabled schoolchildren with a "free appropriate public education." 20 U.S.C.A. § 1412(a)(1)(A) (West 2010). A FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction." *Board of Educ. v. Rowley*, 458 U.S. 176, 188-89 (1982) (internal quotation marks omitted).[1] Although the IDEA requires an appropriate education, it "does not require a perfect education." *M.S. ex rel. Simchick v. Fairfax Cnty. Sch. Bd.*, 553 F.3d 315, 328 (4th Cir. 2009). Instead, "a FAPE must be reasonably calculated to confer *some educational benefit* on a disabled child." *M. ex rel. DM v. School Dist. of Greenville Cnty.*, 303 F.3d 523, 526 (4th Cir. 2002) (emphasis added).

Given the relatively limited scope of a state's obligations under the IDEA, we agree with the District that the failure to perfectly execute an IEP does not necessarily amount to the denial of a free, appropriate public education. However, as other courts have recognized, the failure to implement a material or significant portion of the IEP can amount to a denial of FAPE. *See Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007) ("[A] *material* failure to implement an IEP violates the IDEA."); *Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1027 n.3 (8th Cir. 2003) ("[W]e cannot conclude that an IEP is reasonably calculated to provide a free appropriate public education if there is evidence that the school actually failed to implement an essential element of the IEP that was necessary for the child to receive an

---

[1]The statute under consideration in *Rowley* was the "Education of the Handicapped Act," *see Board of Educ. v. Rowley*, 458 U.S. 176, 179 (1982), which was amended in 1990 and retitled as the IDEA, *see Gadsby ex rel. Gadsby v. Grasmick*, 109 F.3d 940, 942 n.1 (4th Cir. 1997).

educational benefit."); *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000) ("[A] party challenging the implementation of an IEP must show more than a *de minimis* failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP."). Accordingly, we conclude that a material failure to implement an IEP, or, put another way, a failure to implement a material portion of an IEP, violates the IDEA.

The District contends that its failure to completely implement the 2005-06 IEP was not material because, as determined by the LHO, T.H. in fact received some educational benefit during that school year. According to the District, the district court erred by failing to give proper deference to the LHO's factual findings on this point. We disagree.

Preliminarily, we note that it is not entirely clear whether the LHO concluded that the District failed to provide a FAPE for the 2005-06 school year. Portions of the LHO's opinion seem to indicate that it found a denial of FAPE — the LHO stated that the District "den[ied] T.H. a FAPE for the approximately 5.0 to 7.5 hours each week he was to be provided ABA therapy and didn't receive it in the [f]all of 2005," J.A. 778, and that the District's "violations of T.H.'s IEPs did interfere somewhat with T.H.'s access to a FAPE," J.A. 780. However, the LHO also stated that T.H. had made progress and that T.H. received more than minimal educational benefit during the 2005-06 and 2006-07 school years, *see* J.A. 781, statements that, when considered in light of the scope of a state's obligation under the IDEA, suggest the District's failings did *not* deny T.H. a FAPE. *See, e.g.*, *MM ex rel. DM*, 303 F.3d at 526. There is, however, no need for us to decide whether the LHO determined that the District did not deny T.H. a FAPE, as the District argues, or that the District did deny T.H. a FAPE, as the parents argue, because the district court gave sufficient deference to the LHO's decision.

A district court considering a challenge to a state administrative decision in an IDEA case makes an independent decision based on its view of the preponderance of the evidence. *See* 20 U.S.C.A. § 1415(i)(2)(C)(iii) (West 2010). The district court must give "due weight" to the administrative proceedings, but the findings of fact and ultimate decision as to whether the state has complied with the IDEA are made by the district court. *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 103 (4th Cir. 1991). "Due weight" means that administrative findings "are entitled to be considered *prima facie* correct, akin to the traditional sense of permitting a result to be based on such fact-finding, but not requiring it." *Id.* at 105.

In this case, the district court explicitly recognized that the LHO's factual findings were "regularly made" and thus did not fall within the exception to the due-weight requirement articulated in *Doyle*. *See id.* at 104, 105 (explaining that if an administrative officer departs "so far from the accepted norm of a fact-finding process designed to discover truth" — for example, by rejecting credibility determinations made by the hearing officer — the findings cannot be considered "regularly made" and those findings are entitled to no weight); *see also J.P. ex rel. Peterson v. County Sch. Bd. of Hanover Cnty., Va.*, 516 F.3d 254, 259 (4th Cir. 2008) ("When determining whether a hearing officer's findings were regularly made, our cases have typically focused on the *process* through which the findings were made."). The district court acknowledged and accepted the LHO's factual findings, but the court believed that the evidence considered as a whole pointed to a different legal conclusion than that reached by the LHO. This was entirely appropriate and consistent with the district court's obligation to make its own independent determination of whether the District had provided T.H. with a FAPE.

Moreover, when arguing that the court failed to give proper deference to the LHO's findings, the District largely ignores the significance of the SRO's findings. Like the district court, the SRO was obligated under the IDEA to review the record

and make an independent decision based on his view of the preponderance of the evidence. The SRO weighed the evidence differently than did the LHO and drew different conclusions from the evidence, but the SRO did not improperly reject credibility findings made by the LHO or otherwise depart from the accepted norm of fact-finding. Because the SRO's findings were regularly made, they, too, were entitled to due weight by the district court. *See Doyle*, 953 F.2d at 105 ("When a state administrative appeals authority has departed from the fact-finding norm to such an extent as here, we think the facts so found as a result of that departure are entitled to no weight. . . ."); *Burke County Bd. of Educ. v. Denton*, 895 F.2d 973, 981 (4th Cir. 1990) (rejecting as "simply incorrect" the parents' claim that "deference was due *only* to the review officer's conclusion" (emphasis added)).

The question, then, is whether the district court committed clear error when making its independent determination that the District's failure to implement the 2005-06 IEP constituted a denial of FAPE. *See County Sch. Bd. of Henrico Cnty. v. Z.P.*, 399 F.3d 298, 309 (4th Cir. 2005) (whether a school has satisfied its obligations under the IDEA is a factual issue reviewed for clear error). We believe that question must be answered in the negative. The evidence in the record shows that the 2005-06 school year was an extraordinarily difficult one for T.H. In the fall of 2005, he was "very aversive to the teaching situation," would not sit still "for more than a second or two," J.A. 366, and was engaging in harmful behaviors like biting himself and wiping his face until it bled. Painter, the board-certified ABA therapist who worked in the classroom in 2005-06, testified that T.H.'s problems were caused by the failure of the lead teacher and the classroom aides to properly understand and implement ABA techniques, and that it took her until July 2006 to bring T.H. back to the point where he previously should have and would have been if the teachers had understood and properly implemented the ABA methodology.

While there is evidence showing that T.H. made some gains in certain skill areas tested in the spring of 2006, these gains were not so significant as to *require* a conclusion that T.H. received some non-trivial educational benefit from the 2005-06 IEP as implemented by the District. When the evidence of T.H.'s small improvements in a few tested areas is considered against the District's conceded failure to provide the 15 hours of ABA therapy required by the IEP, the evidence that the lead teacher and aides (other than Painter) did not understand or use proper ABA techniques, and the evidence that it took Painter months of working with T.H. to correct the problems caused by the improper implementation of ABA techniques, we cannot say that the district court erred, much less clearly erred, by concluding that the District's failure to properly implement material portions of the IEP denied T.H. a FAPE for the 2005-06 school year. *Cf. Hall ex rel. Hall v. Vance Cnty. Bd. of Educ.*, 774 F.2d 629, 636 (4th Cir. 1985) ("Congress did not intend that a school system could discharge its duty . . . by providing a program that produces some minimal academic advancement, no matter how trivial.").

B.

Although the District now concedes that it did not provide a FAPE for the first part of the 2006 school year, it contends that as of the date of the due process hearing (December 6, 2006), it had remedied the problems with its autism program. The District thus argues that the district court should have held that the District was *capable* of providing a FAPE as of December 6, 2006. The District contends that such a conclusion is relevant to the determination of the scope and extent of the remedy to be imposed for the District's failure to provide a FAPE.

We agree as a general matter that post-removal changes or improvements to a school's educational program can be relevant in the remedial context, *cf. M.S. ex rel. Simchick*, 553

F.3d at 325 (noting that when determining whether reimbursement is appropriate, the district court may consider, among other things, "the existence of other, perhaps more appropriate, substitute placements"), and we will assume that the District's post-removal capability to properly implement an IEP would be relevant to the remedial question in this case. Even with that assumption, however, we cannot conclude that the district court erred by not finding that the District was capable of providing a FAPE at the time of the due process hearing.

The evidence of the District's improved capabilities was far from concrete. The evidence established that the District had entered into a contract with MaySouth, Inc., to provide ABA consultation services, technical assistance, and training as needed by the District. As of the time of the hearing, however, a MaySouth consultant had observed the autism classroom, but there had been no ABA training or supervision, nor had MaySouth and the District even yet settled on a schedule for visits by a consultant. (A MaySouth consultant testified that he expected a consultant would probably visit the school about once a week, but certainly no less than once every two weeks.) The District had also engaged the services of Dr. Eric Drasko, a professor from the University of South Carolina and an acknowledged expert in the field, but again, the evidence of the services he was to provide was far from certain or specific.[2] This evidence certainly shows that the District was taking seriously the need to improve its program for educating autistic students. We cannot say, however, that the District's evidence so compellingly established the District's capability at the time of the due process hearing that the district court committed clear error by not finding the District capable of providing a FAPE to T.H.

---

[2]Dr. Shawn Hagerty, the District's special education coordinator, testified that Drasko was "looking at the big picture. . . . , seeing what independent functional skills the kids need in order to generalize, maintain, and to expand across all the environments," J.A. 646, and that Drasko was otherwise "always available" by email, J.A. 646, and would be available for meetings once a month.

III.

We turn now to the District's challenge to the determination that the home placement was appropriate and therefore would serve as the "stay put" placement until the District established an adequate program.[3] According to the District, the home placement is not appropriate because it is too restrictive and because the parents failed to present sufficient evidence that the home placement was reasonably calculated to provide an educational benefit to T.H.

The IDEA requires states seeking education funding to ensure that

> [t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C.A. § 1412(a)(5)(A) (West 2010). The LHO applied this statutory preference for "mainstreaming" to T.H.'s home placement, concluding that the home placement was not the

---

[3]Under the "stay put" provision of the IDEA, "during the pendency of any proceedings conducted pursuant to this section, . . . the child shall remain in the then-current educational placement of the child" absent the consent of the parents and school officials. 20 U.S.C.A. § 1415(j) (West 2010). We further note that while the question of remedy is not at issue in this appeal, the appropriateness of a home placement also affects parents' eligibility for reimbursement of the costs associated with the home placement. *See M.S. ex rel. Simchick v. Fairfax Cnty. Sch. Bd.*, 553 F.3d 315, 324 (4th Cir. 2009).

least restrictive environment and therefore was not appropriate.

As the district court noted, however, this circuit has "never held that parental placements must meet the least restrictive environment requirement." *M.S. ex rel. Simchick*, 553 F.3d at 327. As we have explained,

> mainstreaming is a policy to be pursued so long as it is consistent with the Act's primary goal of providing disabled students with an appropriate education. Where necessary for educational reasons, mainstreaming assumes a subordinate role in formulating an educational program. In any event, the Act's preference for mainstreaming was aimed at preventing schools from segregating handicapped students from the general student body; the school district has presented no evidence that the policy was meant to restrict parental options when the public schools fail to comply with the requirements of the Act.

*Carter ex rel. Carter v. Florence Cnty. Sch. Dist. Four*, 950 F.2d 156, 160 (4th Cir. 1991), *aff'd*, 510 U.S. 7 (1993). Thus, while a parental placement is not inappropriate simply because it does not meet the least-restrictive-environment requirement, it is nonetheless proper for a court to consider the restrictiveness of the private placement *as a factor* when determining the appropriateness of the placement. *See M.S. ex rel. Simchick*, 553 F.3d at 327 ("[T]he district court's consideration of [the private placement's] restrictive nature was proper because it considered the restrictive nature only as a factor in determining whether the placement was appropriate under the IDEA, not as a dispositive requirement.").

The evidence established that the parents were well aware of the need for T.H. to interact with non-disabled children. To meet this need, the line therapist who provided ABA therapy to T.H. regularly took T.H. to parks and into the community

for social interactions, and T.H.'s father likewise took T.H. into the community on a daily basis. The district court properly considered this evidence and the restrictiveness of the home placement as a factor, but not the dispositive factor, in its determination of the appropriateness of the home placement.

While more detailed evidence of the nature of the community outings and the manner in which the parents were using the outings to improve T.H.'s social skills would have been preferable, we cannot say that the evidence was so thin that the district court clearly erred by considering it. The District's claim that the more restrictive nature of the home placement and its more limited opportunities for social interaction makes the home placement inappropriate is in reality a complaint about the weight the district court gave this factor when determining the appropriateness of the placement. We see no basis in the record, however, for concluding that the district court's determination about the relative weight to be given to this factor amounted to clear error.

And on the broader question of whether the parents' evidence was sufficient to support the district court's conclusion that the home placement was appropriate, we again find no clear error. A parental placement is appropriate if the placement is "reasonably calculated to enable the child to receive educational benefits," *M.S. ex rel. Simchick*, 553 F.3d at 325 (internal quotation marks omitted), or stated somewhat differently, if "the private education services obtained by the parents were appropriate to the child's needs," *A.K. ex rel. J.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 679-80 (4th Cir. 2007). T.H.'s mother, herself board-certified in ABA therapy, testified that T.H. was receiving approximately 30 hours per week of ABA services provided by an experienced ABA line therapist; that the parents and the ABA therapist made sure T.H. had sufficient opportunities to interact with other children; and that T.H. was progressing both educationally and behaviorally under the home program, in that he was happier,

learning more, and was no longer engaging in the problematic behaviors like wiping his face until it bled.

The SRO, applying the correct legal standard, considered the parents' evidence and concluded that the home placement was appropriate, and the district court properly gave weight to the SRO's analysis.[4] And after considering all of the evidence and the SRO's views, the district court likewise determined that the home placement was appropriate.

The parents' evidence about the home placement was not very extensive, and it was short on details and specifics. Nonetheless, the evidence established that T.H. was receiving intensive ABA therapy, the kind of therapy that the District through its IEPs had concluded was necessary to provide T.H. with an appropriate education, and that T.H. was responding well to the program. Under these circumstances, we believe the evidence was sufficient, if barely, to support the district court's conclusion. We therefore cannot conclude that the district court clearly erred by determining that the home placement was reasonably calculated to enable T.H. to receive educational benefits.

## IV.

Accordingly, for the foregoing reasons, we hereby affirm the decision of the district court.

*AFFIRMED*

---

[4]The LHO's conclusion that the home placement was not appropriate was premised on the fact that the home placement was not the least restrictive environment. As the finding was based on an incorrect understanding of the law, the LHO's finding was not entitled to deference by the SRO or the district court. *See A.K. ex rel. J.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 679-80 (4th Cir. 2007) ("[A] finding is not entitled to deference to the extent that it is based upon application of an incorrect legal standard.").

WYNN, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that Sumter County School District 17 ("the School District") failed to provide T.H. with a free appropriate public education. However, I write separately to dissent from the majority's holding that there was sufficient evidence in the record to show that home-placement was appropriate. In light of this lack of evidence, I would remand this matter to the district court for additional fact finding.

I.

As the majority details, the services provided by the School District were insufficient to provide the educational services needed to comply with the Individualized Education Plans ("IEPs") developed for T.H., an autistic student. *See* 20 U.S.C. § 1401(9) (indicating that, to satisfy their obligation to provide a free appropriate public education, schools must provide special education and related services "in conformity with the individualized education program" designed for the student). Specifically, the School District's failure to ensure the effective provision of Applied Behavior Analysis ("ABA") therapy constituted a failure to implement a material element of each IEP designed to guide T.H.'s education. *See Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1027 n.3 (8th Cir. 2003) (concluding that the IDEA is violated "if there is evidence that the school actually failed to implement an essential element of the IEP that was necessary for the child to receive an educational benefit"); *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000) ("[T]o prevail on a claim under the IDEA, a party challenging the implementation of an IEP must show more than a *de minimis* failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP."). Thus, I agree with the majority's conclusion that the

School District failed to provide T.H. with a free appropriate public education.

I also agree with the majority's analysis of the weight that courts should give to the "least-restrictive environment requirement" when considering the appropriateness of home-placement. Though failure to meet this requirement might establish a school district's failure to comply with the IDEA, *see* 20 U.S.C. § 1412(a)(5)(A), this "requirement" must logically be relaxed when considering the appropriateness of an educational program designed for implementation in the relative isolation of a child's home. However, as the majority recognizes, whether the private placement adheres to this relaxed conception of the restrictiveness requirement is still a factor to be considered when assessing the overall appropriateness of private placement.

Still, notwithstanding my substantial agreement with portions of the majority opinion, I cannot agree with the majority that the home-placement program in place to educate T.H. is "reasonably calculated to enable the child to receive educational benefits." *See M.S. ex rel. Simchick v. Fairfax Cnty. Sch. Bd.*, 553 F.3d 315, 324 (4th Cir. 2009); *Carter v. Florence Cnty. Sch. Dist. Four*, 950 F.2d 156, 163 (4th Cir. 1991) (internal quotation marks omitted).

II.

When assessing the appropriateness of private placement, subject to limited exceptions,[1] we should consider "the same considerations and criteria that apply in determining whether the School District's placement is appropriate[.]" *Frank G. v.*

---

[1]For instance, the private placement can be deemed appropriate even if failing to meet the state education standards or requirements. *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 14 (1993). Also, as indicated above, parents "may not be subject to the same mainstreaming requirements as a school board." *M.S. ex rel. Simchick*, 231 F.3d at 105.

*Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006). As such, we must determine whether the proposed placement provides "educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 188-89 (1982)(internal quotation marks omitted).

Here, the only evidence provided as to the design of the educational program provided for T.H. at home was the testimony of his mother, May Baird. Baird testified that she had hired Laura Walkup, "a young woman who has experience working in an ABA program," to work with T.H. during the school week. When pressed on cross-examination, she admitted that she was unsure how many hours Walkup worked with T.H. during a given week, stating that her husband "would be a better one to answer that." Indeed, Baird indicated throughout her testimony that she was "not the best one to answer" questions regarding the details of the services provided to T.H. because she is "often not home." However, Baird was able to approximate that Walkup worked with T.H. for "20 to 30 hours" per week.

Notably, Baird failed to elaborate on the details of the educational services provided by Walkup. Problematically, she made no mention of the goals of the therapy, indicating merely that Walkup was "working on specific objectives." This lack of specificity stands in stark contrast to the IEPs developed for T.H., which include pages of detailed educational objectives related to, *inter alia*, his "socialization skills," "classroom work skills," "general knowledge and comprehension skills," "daily living skills," and "functional communication skills." Moreover, Baird provided no testimony regarding how the program was designed to measure progress toward the unidentified "specific objectives," or how much progress was required to demonstrate accomplishment of said objectives. In short, given that the Court is asked to consider whether the program designed for T.H. would meet

his "unique needs," without more clarification of the contents of the program, I cannot answer that question affirmatively.

In addition, Baird made no mention of the services other than ABA therapy, if any, that were provided for T.H. at home.[2] As noted by the School District, there was "no evidence that speech-language therapy or occupational therapy, two related services included in the school IEP as supportive services . . . were provided in the home program." Brief of Appellant at 47. To be sure, given T.H.'s autism, properly administered ABA therapy was a necessary component of any plan reasonably calculated to confer on him an educational benefit. But the ill-defined nature of that therapy counsels us to remand this matter to the district court for the fact-finding necessary to determine whether its provision was sufficient to demonstrate the appropriateness of home-placement.

That said, the evidence concerning therapy was not the only evidence offered concerning the program in place to educate T.H. at home. Baird also testified about opportunities provided for T.H. to socialize. Presumably, this testimony was given in an attempt to demonstrate compliance with the least-restrictive-environment requirement. But, even under an appropriately relaxed restrictiveness inquiry, there was insufficient evidence to demonstrate that the home-placement program would provide T.H. with adequate opportunities to interact with children who are not disabled. This point is acknowledged, in part, by the majority opinion which states that "more detailed evidence of the nature of the community outings and the manner in which the parents were using the outings to improve T.H.'s social skills would have been preferable."

---

[2]As noted by the District, there was "no evidence that speech-language therapy or occupational therapy, two related services included in the school IEP as supportive services . . . were provided in the home program." Brief of Appellant at 47.

Indeed, scant evidence was provided regarding opportunities for T.H. to interact with non-disabled children. Baird testified that the therapist hired to work with T.H. "fairly regularly" took him "for social opportunities on playgrounds and stuff around locally." She also indicated that T.H.'s father took the child into the community "on a daily basis." However, Baird, who was not present during these outings, was unable to testify as to their duration. Also, her testimony is unclear regarding the frequency with which T.H. interacted with *non-disabled* children during these trips into the community.[3] If undefined periods of socialization with other children, regardless of whether or not they are disabled, are sufficient to satisfy the "least-restrictive-environment requirement," that requirement is rendered a nullity.

In sum, where there was insufficient evidence as to how the plan designed to educate a child at home is calculated to actually provide an educational benefit, it was error for the district court to say that the "calculation" was reasonable. Accordingly, this matter should be remanded so that the district court can further examine the contents and structure of the plan proposed during home-placement. Without more evidence explaining the contents of the plan, a conclusion regarding its adequacy cannot be drawn absent considerable speculation.

---

[3]Baird was asked if T.H. had "an opportunity to relate to . . . typically developing peers, other peers, or other opportunities for social interaction." She replied, "He does out in the community, yes, and with, with friends, family members of friends." Baird did not clarify whether, in mentioning these friends or their family members, she was identifying "typically developing peers" or instead "other peers." Similarly, when asked on cross-examination about T.H.'s social interactions with "typically developing peers," Baird mentioned "family friends that have children that are [T.H.'s] age that he can interact with," but did not discuss how often those children were available to interact with T.H.