PATRICK E. HIGGINBOTHAM, Circuit Judge,
dissenting:
This is a suit for money damages against a school district for failing to modify or properly enforce Ms. Stewart’s IEP to protect her from sexual contact with fellow students. In reversing the district court’s dismissal, the panel majority permits Ms. Stewart to use § 504 of the Rehabilitation Act to enforce her IEP though she never exhausted her administrative remedies under the IDEA. The majority then misapplies § 504 to create tort liability for money damages against the school district. I respectfully dissent.
I.
Drawing upon a notion of “bilateral cooperation” from Title VII, the majority concludes that § 504 imposed on the school district “an ongoing responsibility to calibrate Stewart’s IEP to effectively address the behaviors intended to be prevented by keeping her separated from males and under close supervision.” The majority reverses the dismissal below because Stewart’s complaint — which devotes itself to chronicling the shortcomings of her IEP — “plausibly states that the [school] [district acted with gross misjudgment.” It reaches this holding “regardless of what role Stewart allegedly played in facilitating th[e] misconduct,” because “effective implementation [of Stewart’s IEP] would have obviated any need for discipline.”
Yet for all the majority’s focus on Stewart’s IEP, it fails to recognize that the IEP is a creature, not of § 504, but of the IDEA, a quite distinct federal statute. True enough, the IDEA imposes an obligation on the school district to provide an appropriate education that entails furnishing those “related services” necessary to that end — here, amending and enforcing Ms. Stewart’s IEP to keep her separated from her male classmates.[1] The IDEA *532 contains its own detailed remedial scheme — an “interactive process” between parents and school districts whose absence the majority bemoans.[2] This process is enabled by congressional insistence that a disabled student exhaust her remedies before resorting to the courts, at least where she “seek[s] relief that is also available under” the IDEA.[3]
Here, neither the complaint nor the amended complaint suggests that Ms. Stewart’s parents or guardians ever contacted the school district about any of the alleged instances of sexual abuse, much less the district’s responses to them. Ms. Stewart nevertheless attempts to avoid exhaustion by requesting money damages. But at the heart of Ms. Stewart’s lawsuit is a dispute over the content and implementation of her IEP, a matter that clearly falls within the purview of the IDEA and is capable of resolution through its administrative processes.[4] Stewart’s allegations leave little doubt on this point:
• [Paragraph 15:] In February 2006, even though [Stewart’s] IEP dictated, that she was to be kept separate from male classmates and was to be closely supervised, she was again sexually abused by another student, this time in the bathroom. Again, Waco ISD officials were aware of the incident but her IEP was unmodified and no additional steps were taken to protect [Stewart] from further sexual abuse.
• [Paragraph 16:] In August 2006, with [Stewart’s] IEP still mandating that she be kept separate from male classmates and be closely supervised, she was permitted to go to the bathroom unattended.... Unfortunately and unsurprisingly, [Stewart] was sexually abused in the bathroom by [a] male classmate. Waco ISD officials were again aware of this incident and again did not make any changes to [Stewart’s] IEP or take any steps to ensure that she would not be sexually abused in the future.
• [Paragraph 17:] In October 2007, with [Stewart’s] IEP still mandating that she be kept separate from male classmates and be closely supervised, she was again sexually abused by a male classmate who exposed himself to her. Again ... school officials suspended [Stewart] from school, depriving her of an educational benefit.
• [Paragraph 21:] There is nothing indicating any efforts by Waco ISD to properly train and supervise Waco ISD.staff in the effective implementation of [Stewart’s] IEP. As a result, staff members repeatedly failed to follow the requirements of [Stewart’s] IEP.
• [Paragraph 22:] Despite the determinations by school officials that [Stewart] was complicit in some of these instances of sexual abuse, there is nothing indicating that any sort of sexual education was contemplated by her ARD Commit *533 tee and her IEP did not dictate any sort of education for [Stewart] in the inappropriateness of sexual contact at school.
• [Paragraph 26:] [Stewart] asserts that Waco ISD has violated [her] rights pursuant to [§ 504 of the] Rehabilitation Act. Defendant’s practices and/or proposed actions, set out in detail above, have, together and separately, contributed to violating her rights under [§ 504].
• [Paragraph 27:] In addition and in the alternative, the failure of the school district to keep [Stewart] safe from a knoum harm while on campus constitutes a gross mismanagement of her educational plan and also a violation of the Rehabilitation Act thereby.
• [Paragraph 28:] Furthermore, the failure to train or supervise Waco ISD staff to ensure that [Stewart’s] IEP was properly carried out constitutes a gross mismanagement of her education plan and a violation of the Rehabilitation Act thereby.
In such circumstances, the mere fact that Ms. Stewart prefers a monetary remedy does not exempt her from the statute’s exhaustion requirement.[5] For the same reason, Ms. Stewart’s perfunctory allegation that exhaustion would be “futile” is unpersuasive.[6]
That we cannot know with certainty what Stewart’s timely recourse to her IDEA remedies would have produced is inherent in the requirement of exhaustion. Perhaps those remedies would have avoided all that has followed, or perhaps they would have ultimately fallen short. But “parents cannot know that without asking, any more than we can.”[7] The cardinal function of exhaustion is to “enable the agency to develop a factual record, to apply its expertise to the problem, to exercise its discretion, and to correct its own mistakes.”[8] Other than in exceptional circumstances that clearly fall outside of the purview of the IDEA, we ought not allow litigants to short-circuit this inherently discretionary process with their own predictions as to what results it might have produced.[9] Here, the allegations in Stewart’s complaint leave me convinced “that at least in principle!,] relief is available under the IDEA.”[10]
The majority passes over the threshold question of exhaustion because the school district “failed to raise the issue on appeal or in its motion-to-dismiss briefing before the district court.” But we are reviewing the judgment of the district court and can affirm its dismissal on any ground raised below and supported by the pleadings.[11] *534 Here, Stewart pleaded exception to exhaustion. The district’s answer not only denied those pleadings but asserted Stewart’s failure to exhaust as an affirmative defense. The exhaustion issue was indisputably presented to the district court. We not only have the authority to affirm on that basis, but the duty, as the district court’s judgment is plainly sound, albeit for reasons it did not reach.
The majority also suggests that exhaustion does not apply because Stewart seeks damages for past physical harms, not “prospective forms of educational relief or related services.” To the extent any injury suffered by Stewart as a result of the school district’s alleged mismanagement of her IEP — physical or otherwise — cannot now be redressed through the IDEA’S administrative processes, this result is itself the consequence of Stewart’s failure to timely exhaust. To hold that a disabled student can avoid exhaustion simply by waiting to bring her damages claim until administrative remedies are no longer useful would gut the exhaustion requirement of all meaning.[12]
Congress has elected to channel disputes over the difficulties encountered in mainstreaming disabled children first to the school house, bringing parent and teacher to the conference table. The congressional judgment is that the overwhelming majority of disputes will be resolved in the process. If the effort fails to achieve the desired result, parents can resort to the courts. At that juncture, there is less reason to look forward, and more reason to look backward and allocate responsibility for a failure.
II.
Exhaustion aside, the majority is obligated to read § 504 in harmony with the IDEA and abide the statutes’ differences. As the Supreme Court recognized in Smith v. Robinson, “Congress did not intend a handicapped child to be able to circumvent [the IDEA’s] requirements or supplement [its] remedies ... by resort to the general antidiscrimination provision of § 504.”[13] This means that when an IEP is in place, its shortcomings must find their answer within the detailed remedial scheme under the IDEA unless those shortcomings are somehow of a meaningfully distinct character. That distinction inheres in the language of § 504 as read by the Supreme Court and this Circuit — it is triggered by a “refusal” by the school district to grant a disabled student’s request for a reasonable accommodation.[14]
*535 Several courts have gone a step further, substituting “gross misjudgment or bad faith” for refusal.[15] But that was to address the reality that a literal insistence upon a request for accommodation could frustrate the core purpose of § 504 — to prevent discrimination against persons with disabilities.[16] It was not to expand the statute’s reach. Accepting this judicial effort, if the congressionally stated liability of § 504 is not to be expanded to reach negligent conduct, then at the least, the words substituted for “refusal” must do no more than capture non-literal refusals. “Bad faith” appears to be fit for this surrogate task, with its draw upon intentionality. “Gross misjudgment” less so. And potentially devastatingly less so. It appears to be not a surrogate for refusal, but “a species of heightened negligence.” Yet as the majority correctly suggests, the level of culpability actionable under § 504 should be “consonant with” the “deliberate indifference” we require under the virtually identical discrimination prohibition of Title IX.[17] As we observed in Brown v. Sibley, “[t]he overwhelming similarity of these ... passages is no accident. Congress expressly modeled the discrimination prohibition contained in section 504 after the prohibitory language contained in ... Title IX.”[18]
Here, the majority observes, Ms. Stewart’s amended complaint alleges that the school district responded to the first incident of misconduct by modifying Stewart’s IEP and the second and fourth by investigating the respective incidents and suspending her. Thus, the majority concludes, “although the District’s responses may leave something to be desired, the complaint provides insufficient facts to plausibly state that the District’s responses were so clearly unreasonable as to rise to the level of deliberate indifference.” But the majority continues on, drawing an inference of “bad faith or gross misjudgment” from the school district’s alleged mismanagement of Stewart’s IEP — now relying on “the three subsequent instances of alleged sexual abuse.” This, notwithstanding the fact that Stewart’s “cursory” amended complaint, filed with time for discovery, is bereft of detail,
fail[ing] to address the harassers’ identities and relationship to Stewart, the punishments meted out to the harassers, the nature of the abuse, the names and responsibilities of District personnel with knowledge of the harassment, the time-delay between the abuse and the District’s response, the extent of Stewart’s harm and exclusion from educational opportunities, the specific reasons why the District’s responses were obviously inadequate, or the manner in which such responses likely made Stewart susceptible to further discrimination.
With all respect, the majority has in its application of controlling standards created tort liability for money damages, allowing Stewart to proceed on pleadings that, at best, state a plausible claim for over *536 sight or negligence.[19] It signifies that Ms. Stewart in her original complaint characterized the school district’s failure to abide her IEP as “actionable negligence,” a characterization carefully omitted from the amended complaint.[20]
III.
Today, the majority allows parents unhappy with an IEP to bypass the comprehensive remedial scheme of the IDEA and sue under § 504 for money damages. It then misapplies § 504 to impose on schools a tort-like duty not to mismanage a disabled student’s IEP. This unfortunate consequence defies precedent. I would hold that Ms. Stewart’s failure to exhaust administrative remedies under the IDEA bars her from seeking money damages under § 504. Alternatively, I would hold that bad faith, gross misjudgment, and deliberate indifference all rest upon substantially identical levels of culpability— levels that approximate the discriminatory animus § 504 was intended to capture. On either wing, the district court’s dismissal ought be affirmed.

. See 20 U.S.C. §§ 1400(d)(1), 1401(26)(a), 1412, 1414, 1415; see also Houston Indep. Sch. Dist. v. Bobby R., 200 F.3d 341, 349 (5th Cir.2000) (holding that a school district violates the IDEA where it "fail[s] to implement substantial or significant provisions of the IEP.”); Sumter Cnty. Sch. Dist. 17 v. Heffernan ex rel. TH, 642 F.3d 478, 484 (4th Cir.2011) (holding that "a material failure to implement an IEP ... violates the IDEA.”); Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J, 502 F.3d 811, 822 (9th Cir.2007) (holding that "a material failure to implement an IEP violates the IDEA.”); Neosho R-V Sch. Dist. v. Clark, 315 F.3d 1022, 1027 n. 3 (8th Cir.2003) (holding that ”fail[ure] to implement an essential element of [an] IEP that was necessary for the child to receive an educational benefit” violates the IDEA).

.Cf. Sch. Comm. of Town of Burlington, Mass. v. Dep’t. of Educ. of Mass., 471 U.S. 359, 368, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) ("In several places, the [IDEA] emphasizes the participation of the parents in developing the child’s educational program and assessing its effectiveness.”); Klein Indep. Sch. Dist. v. Hovem, 690 F.3d 390, 395 (5th Cir.2012) ("The IDEA requires that school districts allow parents to play a significant role in the development of IEPs for each child with a disability ... [and] also requires states to establish procedures to resolve IEP-related disputes between parents and school districts.”).

. See 20 U.S.C. § 1415(7).

. See, e.g., Rose v. Yeaw, 214 F.3d 206, 210 (1st Cir.2000) (rejecting a § 504 claim predicated on the school district’s alleged "general] fail[ure] to implement [the plaintiff's] Plan,” observing that the claim ”relate[s] unmistakably to the evaluation and educational placement of [the plaintiff] ... and to the provision of a free appropriate education”).

. See Charlie F. v. Bd. of Educ. of Skokie Sch. Dist., 98 F.3d 989, 992 (7th Cir.1996) (Easterbrook, J.) (rejecting the argument that a suit for money damages is automatically exempt from the IDEA'S exhaustion requirement, reasoning that " ‘relief available' ... mean[s] relief for the events, condition, or consequences of which the person complains, not necessarily relief of the kind the person prefers.”).

. See Rose, 214 F.3d at 210-11.

. Charlie F., 98 F.3d at 993.

. Christopher W. v. Portsmouth Sch. Comm., 877 F.2d 1089, 1094 (1st Cir.1989).

. Cf. e.g., Padilla v. Sch. Dist. No. 1, 233 F.3d 1268, 1274 (10th Cir.2000) (''[T]he dispositive question generally is whether the plaintiff has alleged injuries that could be redressed to any degree by the IDEA’S administrative procedures and remedies.... Where the IDEA'S ability to remedy a particular injury is unclear, exhaustion should be required in order to give educational agencies an initial opportunity to ascertain and alleviate the alleged problem.”).

. Charlie F„ 98 F.3d at 993.

. Montoya v. FedEx Ground Package Sys., Inc., 614 F.3d 145, 148-49 (5th Cir.2010) (Haynes, J.) (”[I]t is well established ... that the court of appeals ‘may affirm a district court's Rule 12(b)(6) dismissal on any grounds raised below and supported by the record.' ”).

. Cf. Polera v. Board of Educ. of the Newburgh Enlarged City Sch. Dist., 288 F.3d 478 (2d Cir.2002) ("We ... consider it incongruous that [the plaintiff] waited years before pursuing any remedy, yet now claims that the remedy available to her at the time — the [IDEA’s] administrative process — would have been too slow.”).

. Smith v. Robinson, 468 U.S. 992, 1011-12, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984). Smith is merely one manifestation of the principle that "a precisely drawn, detailed statute pre-empts more general remedies.” Brown v. Gen. Servs. Admin., 425 U.S. 820, 834, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976) (holding that "[t]he balance, completeness, and structural integrity” of Title VII evidence that Congress intended it to provide the exclusive remedy for claims of discrimination in federal employment); see also Preiser v. Rodriguez, 411 U.S. 475, 489-90, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) (holding that challenges to the fact or scope of imprisonment must be brought under the habeas statute, not § 1983, as the former is the "more specific act.”).

.Southeastern Community College v. Davis, 442 U.S. 397, 412-13, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979); D.A. v. Houston Indep. Sch. Dist., 629 F.3d 450, 454 (5th Cir.2010) ("Further constraining the viability of claims under the disability non-discrimination laws is this courts long-established rule that[] a cause of action is stated under § 504 when it is alleged that a school district has refused to provide reasonable accommodations.”).

. See, e.g., Monahan v. Nebraska, 687 F.2d 1164, 1170 (8th Cir.1982).

. See D.A., 629 F.3d at 454 ("[We] used the term 'refusal' because the statute requires intentional discrimination against a student on the basis of his disability. This is consistent with [Monahan ].”).

. See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) (noting that to merit an award of damages under Title IX, the school’s response "must amount to deliberate indifference to discrimination”); see also S.S. v. Eastern Kentucky Univ., 532 F.3d 445 (6th Cir.2008) (evaluating a § 504 claim predicated on disability-based peer-on-peer harassment under the “deliberate indifference” standard).

.650 F.2d 760, 768 (5th Cir.1981) (citing S.Rep. No. 93-1297 (1974), reprinted at 1974 U.S.C.C.A.N. 6373, 6390-91).

. Stewart's bald allegations of "sexual abuse” fail the federal pleading standard. See Ashcroft v. Iqbal, 556 U.S. 662, 681, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ("To be clear, we do not reject these bald allegations on the ground that they are unrealistic or nonsensical .... It is the conclusory nature of respondent's allegations ... that disentitles them to the presumption of truth.”).

. Ms. Stewart's amended complaint departs from her state-court complaint in another noteworthy regard. Whereas the amended complaint suggests that school officials took no action to protect Stewart from peer-on-peer sexual contact in school bathrooms, the original complaint represented that Ms. Stewart's "special education teacher reports that the school did make some attempt to address this problem by permitting [Ms. Stewart] to go to the bathroom after a tardy bell, while the restroom and hall were supposedly clear of any other students.”).