[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-14824

_____

D.C. Docket Nos. 0:11-cv-60772-KAM; 0:11-cv-60780-KAM

L.J., by his mother and next friend, N.N.J., and N.N.J.,

Plaintiff-Appellant,

versus

SCHOOL BOARD OF BROWARD COUNTY, FLORIDA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 26, 2019)

Before JORDAN, GRANT, and HULL, Circuit Judges.

GRANT, Circuit Judge:

L.J. and his mother surely have more experience than they would wish for in navigating the contours of the Individuals with Disabilities Education Act (IDEA) and its challenge procedures.  And, to be fair, the school system likely harbors its own regrets about the amount of litigation that has occurred over the last decade-

and-a-half.  Since his third-grade year, L.J.—who has been diagnosed with autism and a speech-and-language impairment—has received special education and related services under the IDEA, a statute that carries an educational guarantee for students with special needs: an individualized education plan (IEP) "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew F. v. Douglas Cty. Sch. Dist.*, 137 S. Ct. 988, 999 (2017).  But even accounting for this guarantee, L.J.'s path through school has not been a clear one; as early as 2002, his third-grade year, he and his mother have challenged his schools' plans for him, arguing at various times that the plans' content, the plans' implementation, or both, were insufficient.  The current challenge is related only to implementation—that is, whether and how the school put its plan into action.  The question we face is how to ensure that the IDEA's guarantee of a free appropriate public education is honored not only in the content of an IEP, but also in its implementation.  And because those two issues—content and implementation—are different in their nature—plan versus action—our analyses of shortfalls in those areas also must be different.  Because the content outlined in a properly designed IEP is a proxy for the IDEA's educational guarantee, we conclude that a material deviation from that plan violates the statute.  Applying that standard to this case, we do not see a material deviation from L.J.'s IEP, and therefore affirm the judgment of the district court.

## I.

Congress passed the IDEA in 1975 "to ensure that all children with disabilities have available to them a free appropriate public education."  20 U.S.C.

2

§ 1400(d)(1)(A).[1]  To achieve that goal, the federal government provides funds to states in exchange for their compliance with a set of regulations aimed at delivering "special education and related services designed to meet" disabled children's "unique needs and prepare them for further education, employment, and independent living."  *Id.*  Congress directed, and the IDEA's scheme depends on, cooperation between schools and parents to best identify and serve disabled children's needs.  *See id.* § 1400(d)(1)(B), (d)(3); *Schaffer v. Weast*, 546 U.S. 49, 53 (2005) (identifying the "core of the statute" as "the cooperative process that it establishes between parents and schools").

The individualized education program is "the centerpiece of the statute's education delivery system for disabled children."  *Honig v. Doe*, 484 U.S. 305, 311 (1988).  The IDEA defines an IEP as "a written statement for each child with a disability that is developed, reviewed, and revised" according to specific procedures and that includes a roadmap for the child's academic growth and development.  20 U.S.C. § 1414(d)(1)(A)(i).  The IEP is a "plan" that "requires a prospective judgment by school officials," and crafting it is a "fact-intensive exercise."  *Endrew F.*, 137 S. Ct. at 999.  Parents and educators work together as the "IEP Team" to draft and update a child's IEP, with the IDEA laying out both the general IEP process and a checklist of items that the plan should include—things like "a statement of the child's present levels of academic achievement and functional performance," "a statement of measurable annual goals," and "a

---

[1] The IDEA was initially known as the Education for All Handicapped Children Act.  In 1990, when Congress reauthorized the Act, it changed the name to the IDEA.  For simplicity's sake, we refer only to the Act's current name.

statement of the special education and related services and supplementary aids and services . . . to be provided to the child."  20 U.S.C. § 1414(d)(1)(A)(i), (d)(1)(B).  *See generally id.* § 1414.  The IDEA also provides a detailed set of "procedural safeguards" to protect disabled children and their parents.  *See generally id.* § 1415.  Those safeguards include a graduated set of dispute resolution mechanisms: informal meetings, formal mediation, a "due process hearing" before a state or local administrative agency, and, if necessary, judicial review.  *See id.* And while the dispute resolution process plays out, the IDEA guarantees that— unless the school and parents agree otherwise—"the child shall remain in the then-current educational placement of the child."  *Id.* § 1415(j).  This guarantee is known as the "stay-put" provision.[2]

The IDEA allows parents to challenge "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education."  *Id.* § 1415(b)(6)(A).  Disagreements over a disabled child's education can take different forms.  Sometimes the child's parent will argue that the school's proposed IEP is inadequate and thus fails to offer a free appropriate public education.  In those *content* cases, the Supreme Court recently made clear that to "meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew F.*, 137 S. Ct. at 999.  Other times, in what are more fairly called *implementation* cases, the parent will argue that

---

[2] The stay-put provision was previously located at § 1415(e)(3), and earlier cases cite that subsection.  *See, e.g.*, *Honig*, 484 U.S. at 323.  The modern stay-put provision found in § 1415(j) has survived congressional amendments to the Act with only minor linguistic changes.

while their child's IEP clears the IDEA's substantive threshold *as written*, the school has nonetheless failed to properly put the plan into practice.  The Supreme Court has not yet articulated a standard for these *implementation* cases, and neither have we.  But today we conclude that a material deviation from the content of an IEP violates the IDEA.

## II.

L.J., a child with autism and a speech-and-language impairment, was a student in the Broward County public school system during his kindergarten, elementary school, and middle school years.  During his third-grade year, education professionals at his elementary school worked with L.J.'s mother to develop an individualized education program for him.  That IEP remained in place for several years as L.J. progressed through elementary school.

When L.J. entered middle school three years later, the school board proposed a new IEP that it believed would better suit his needs in the new environment.  L.J., meanwhile, strongly disliked the new middle school setting and immediately exhibited a range of problematic behaviors—including persistent refusal to attend school.  L.J.'s mother ended up homeschooling him for most of his sixth-grade year, and in August of that year she filed an IDEA complaint challenging the content of the middle school's proposed IEP.  She also invoked the IDEA's "stay-put" provision so that the school was required to continue to implement L.J.'s elementary school IEP while her challenge to the proposed middle school IEP progressed through the system.

5

Over the fall and spring of L.J.'s sixth-grade year, his mother continued to file complaints challenging various aspects of L.J.'s education, including the school's implementation of his elementary school stay-put IEP.  An administrative law judge (ALJ) consolidated five complaints from L.J.'s mother as well as one filed by the school and held hearings over an eight-month period during L.J.'s sixth-grade year.  The summer after sixth grade, the ALJ issued a decision addressing the content of the new IEP and the implementation of the old one; he found both that the content of the proposed middle school IEP was appropriate and that the school had adequately implemented the elementary school stay-put IEP during the challenge.  L.J.'s mother appealed from that decision, and a district judge affirmed it.[3]  That case and the time period it involved—L.J.'s sixth-grade year—are no longer before us.  But because of that case, at all times relevant to this appeal, the school was required to implement L.J.'s elementary school stay-put IEP.

L.J. returned to his public school for his seventh-grade year, but despite the apparent efforts of both his mother and the school, his attendance problems continued: due to a combination of illness and refusal to attend, L.J. was absent for

_____

[3] We dismissed an appeal from that case for lack of jurisdiction.  In addition to concluding that the proposed middle school IEP and the school's implementation of the elementary school stay-put IEP both passed muster, the district court concluded that the school owed "compensatory education in the form of monies to cover the costs of behavioral services for the period from September 19, 2005 to December 12, 2006 in which Defendant failed to provide a behavioral [independent educational evaluation]."  *L.J. v. Broward Cty. Sch. Bd.*, No. 06-61282-CIV, 2008 WL 612881, at *3 (S.D. Fla. Mar. 5, 2008).  Our dismissal order stated that the district court's order was "not final and appealable because it did not resolve the issue of the amount of monies to be included in the compensatory education award, and the district court did not properly certify the March 5 order for immediate review under [Federal Rule of Civil Procedure] 54(b)."  The docket in that case does not reflect any further proceedings after the dismissal order.

well over 100 school days.  All told, L.J. was present for less than a quarter of the class periods during his seventh-grade school year.  That small fraction reflects the fact that L.J. often never even made it to the bus stop, much less through the school doors, and that when he did go to school, he often left early.

In December of L.J.'s seventh-grade year, his mother filed another IEP challenge—the one that eventually resulted in this appeal.  Although the ALJ had found in the first case that the school had adequately implemented the elementary school stay-put IEP through the end of L.J.'s sixth-grade year, L.J.'s mother now alleged that the school had failed to implement that same IEP during the federal judicial proceedings that followed her appeal from the ALJ's order—that is, beginning in seventh grade.  As the administrative challenges continued, so did L.J.'s problems at school, including several violent incidents.  L.J.'s mother eventually removed him from the public school in February 2008, a little more than halfway through his eighth-grade year.

And so began this case, which relates to the time between the ALJ's decision at the end of L.J.'s sixth-grade year and L.J.'s removal from school partway through eighth grade.  Eighteen non-consecutive days of hearings on these new claims spanned over two years between March 2007 and October 2009.  Over a year later, the ALJ issued a written opinion concluding that the school had failed to implement L.J.'s elementary school stay-put IEP during his seventh- and eighth-grade years, the time when the decision approving the content of the proposed middle school IEP was being appealed in federal court.  The ALJ opinion acknowledged the age of the stay-put IEP and recognized that "the School Board

7

found the implementation of the IEP to be very difficult." But after a lengthy recitation of factual findings and specific day-to-day incidents, the ALJ concluded that "there were substantial or significant provisions of [L.J.'s] IEP that the School Board failed to implement." The ALJ also found that the school had discriminated and retaliated against L.J. and his mother for exercising their rights under the IDEA, but the parties have settled that claim and it is not at issue here.

The parties filed complaints in federal district court—L.J.'s mother seeking enforcement of the ALJ's order and additional relief, and the school challenging the order. Soon after, both parties cross-moved for judgment on the administrative record. The district court issued an opinion setting the standard of review and ordering supplemental briefing. *See L.J. v. Sch. Bd. of Broward Cty.*, 850 F. Supp. 2d 1315 (S.D. Fla. 2012). Five years later, it issued a detailed opinion that addressed each alleged implementation deficiency, relied on an extensive review of the administrative record, and ultimately reversed the ALJ's decision.[4] The district court entered judgment in favor of the school. *See L.J. v. Sch. Bd. of Broward*

---

[4] We note that the pace of litigation in this case was inconsistent with the notion that the "most effective means of ensuring disabled children receive an education tailored to meet their specific needs is to provide prompt resolution of disputes over a child's IEP." *Cory D. v. Burke Cty. Sch. Dist.*, 285 F.3d 1294, 1299 (11th Cir. 2002). The Supreme Court has noted the "ponderous" pace that IDEA cases often assume, *see, e.g.*, *Honig*, 484 U.S. at 322, but here there seems to be even more room for improvement than usual. Over two years passed before the ALJ even concluded hearings in this case, and then another fifteen months before the ALJ rendered its decision. The district court had the case for nearly a year before it issued an opinion setting the standard of review and ordering supplemental briefing, and then took *over five years* to issue its final judgment. As a result, L.J.—now 26 years old—is long gone from the Broward County school system, and any compensatory education he could receive from this case is surely less valuable than it would have been during his middle school years. *See Strawn v. Mo. State Bd. of Educ.*, 210 F.3d 954, 957 (8th Cir. 2000) (noting that "children protected by the IDEA benefit greatly from quick resolution of disputes because lost education is a substantial harm, and that harm is exactly what the IDEA was meant to prevent").

8

*Cty.*, No. 11-60772-CIV-MARRA, 2017 WL 6597516 (S.D. Fla. Sept. 28, 2017). L.J.'s mother appealed from that decision, and we now consider whether the school's implementation of L.J.'s elementary school stay-put IEP during his seventh- and eighth-grade school years (up until his removal in the middle of eighth grade) violated the IDEA.

## III.

When a district court reviews an administrative decision in an IDEA case, it must make a decision based on the preponderance of the evidence and give "due weight" to the ALJ's conclusions. *R.L. v. Miami-Dade Cty. Sch. Bd.*, 757 F.3d 1173, 1178 (11th Cir. 2014) (citation omitted). "Due weight" means that a reviewing court "must be careful not to substitute its judgment for that of the state educational authorities," but "the ALJ is not entitled to blind deference" and the district court "is free to accept the ALJ's conclusions that are supported by the record and reject those that are not" so long as it explains any rejections. *Id.* (citation omitted).

When we review a district court's decision in an IDEA case, we review questions of law de novo and findings of fact for clear error. *Id.* at 1181. But where—as here—the district court does not receive additional evidence and its findings are "based solely on a cold administrative record," we "stand in the same shoes as the district court in reviewing the administrative record and may, therefore, accept the conclusions of the ALJ and district court that are supported by the record and reject those that are not." *Id.* (citation omitted).

9

IV.

A.

The IDEA was Congress's response to a national problem: the exclusion of disabled children from the benefits and opportunities of public education.  It gives force to a congressional determination that all children—including those who suffer from disabilities—are entitled to participate in the life of this country's public schools.  To effectuate that goal, the IDEA created an array of procedures allowing parents and schools to work together to provide "special education and related services designed to meet" disabled children's "unique needs."  20 U.S.C. § 1400(d)(1)(A) (stating congressional purpose).  And in 1982, the Supreme Court held that it does more than that: beyond mere procedures, the IDEA confers a substantive right to a "free appropriate public education" for children with disabilities.  *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176 (1982).

*Rowley* set the starting line for IEPs.  Emphasizing that "[i]mplicit in the congressional purpose of providing access to a 'free appropriate public education' is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child," the *Rowley* Court concluded that a covered child's IEP must be "reasonably calculated to enable the child to receive educational benefits."  *Id.* at 200, 207.  The decision, however, left many questions unresolved—expressly declining to "establish any one test for determining the adequacy of educational benefits conferred upon all children covered by the Act."  *Id.* at 202.  But in the years that followed, many circuits

10

concluded that the substantive right *Rowley* described was not so robust after all. *See, e.g.*, *O.S. v. Fairfax Cty. Sch. Bd.*, 804 F.3d 354, 360 (4th Cir. 2015) (requiring only "a benefit that is more than minimal or trivial"); *K.E. v. Indep. Sch. Dist.*, 647 F.3d 795, 810 (8th Cir. 2011) ("some educational benefit") (internal quotation marks and citation omitted); *P. v. Newington Bd. of Educ.*, 546 F.3d 111, 119 (2d Cir. 2008) ("more than only trivial advancement") (internal quotation marks and citation omitted); *Thompson R2-J Sch. Dist. v. Luke P.*, 540 F.3d 1143, 1149 (10th Cir. 2008) ("merely . . . more than *de minimis*") (internal quotation marks and citation omitted).

In 2017, the Supreme Court stepped in again. In *Endrew F. v. Douglas County School District*, the Court rejected the Tenth Circuit's "merely more than *de minimis*" standard because, "[w]hen all is said and done, a student offered an educational program providing 'merely more than *de minimis*' progress from year to year can hardly be said to have been offered an education at all." 137 S. Ct. at 1001. Such a weak standard, the Court reasoned, was out of step with the IDEA's loftier guarantees and with *Rowley* itself. *Endrew F.* drove home the point that to "meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999.

Both *Rowley* and *Endrew F.* explain how an IEP *as written* may fail to clear the IDEA's substantive threshold (and therefore fail to offer a free appropriate public education). Those cases provide useful guideposts to courts evaluating "content" claims. But even where an IEP as written may satisfy the IDEA, schools

11

can also fail to meet their obligation to provide a free appropriate public education by failing to implement the IEP *in practice*. These are "implementation" cases, and it is this second species of IDEA claim that this case presents.

### B.

We have not yet articulated a legal standard to govern implementation cases. For the courts that have, the heart of this issue has been whether any deviation whatsoever from an IEP necessarily violates the IDEA, and—if not—how far is too far. Confronting this issue for the first time ourselves, we conclude that to prevail in a failure-to-implement case, a plaintiff must demonstrate that the school has materially failed to implement a child's IEP. And to do that, the plaintiff must prove more than a minor or technical gap between the plan and reality; *de minimis* shortfalls are not enough. A material implementation failure occurs only when a school has failed to implement substantial or significant provisions of a child's IEP. Under that standard, students and parents can be assured that they will receive the benefits of a properly designed IEP, while schools work to meet those requirements without being inappropriately penalized for *de minimis* failures that do not themselves deprive a student of the educational promise of the IDEA.

Several considerations convince us that a materiality standard—rather than a perfect-implementation requirement—is best suited to determine whether a school has satisfied its obligations under the IDEA, at least with respect to the implementation of an IEP. In determining what those obligations are, we look first to the definition of a "free appropriate public education" in the text of the IDEA:

12

> The term "free appropriate public education" means special education and related services that—
>    (A) have been provided at public expense, under public supervision and direction, and without charge;
>    (B) meet the standards of the State educational agency;
>    (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
>    (D) *are provided in conformity with the individualized education program required under section 1414(d) of this title*.

20 U.S.C. § 1401(9) (emphasis added). When we consider implementation claims, the fourth part of the test is the crux of the matter—we must decide what it means to provide special education and related services "in conformity with [a child's] individualized education program." And we also must decide what it means to fail at that responsibility.

The phrase "in conformity with" suggests that general agreement or congruence, not perfect adherence, is the standard. *See Van Duyn v. Baker Sch. Dist.*, 502 F.3d 811, 821 (9th Cir. 2007) (concluding that the phrase "in conformity with" counsels "against making minor implementation failures actionable"); *see also* 34 C.F.R. § 300.323(c)(2) (requiring education "in accordance with" the IEP). "Conformity" means "[c]orrespondence in form, manner, or use; agreement; harmony; congruity." Black's Law Dictionary 207 (Abridged 6th ed. 1991); *see also* Webster's New World College Dictionary 313 (5th ed. 2014) ("the condition or fact of being in harmony or agreement; correspondence; congruity; similarity"). Conspicuously absent from this definition are words like "exact" or "identical," suggesting that the IDEA recognizes that some degree of flexibility is necessary in

13

implementing a child's IEP.  We see nothing in the text of the IDEA holding schools to a standard of perfect implementation.[5]

To the contrary, statutory context also points toward a materiality standard. In seeking to deliver "special education and related services designed to meet" disabled children's "unique needs," 20 U.S.C. § 1400(d)(1)(A), the IDEA recognizes that a child's individual circumstances and "unique needs" do not remain static as the child progresses from grade to grade.  That is because "children develop quickly and once correct placement decisions can soon become outdated." *Cory D. v. Burke Cty. Sch. Dist.*, 285 F.3d 1294, 1299 (11th Cir. 2002). The statute thus requires a child's IEP team to review and revise the IEP "periodically, but not less frequently than annually."  20 U.S.C. § 1414(d)(4)(A). *Rowley* similarly acknowledged the wide range of situations that an IEP may seek to accommodate.  *See* 458 U.S. at 202–03.  Even in their development, then, we see that IEPs have some amount of flex in their joints with an expectation that parents and schools will work together to keep the plans up to date as circumstances and the child's needs demand.  This recognition counsels against a rigid, perfect-implementation interpretation of "in conformity with."

---

[5] We note, too, that to the extent the phrase "in conformity with" is ambiguous, we are confined to resolve that ambiguity in favor of the school.  The IDEA was promulgated under the federal spending power, and judicial imposition of requirements that the statutory text does not clearly contain would be "contrary to the fundamental proposition that Congress, when exercising its spending power, can impose no burden upon the States unless it does so unambiguously." *Rowley*, 458 U.S. at 190 n.11; *see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 295–96 (2006).  We discern no clearly expressed requirement in the IDEA penalizing anything less than inerrant adherence to an IEP, particularly a stay-put IEP that is years old and was designed for a different school setting.

14

Setting out a standard under which even a *de minimis* failure to implement a particular provision of an IEP would be actionable would also be inconsistent with the recognition that an IEP is a plan, not a contract.  *See* 20 U.S.C. § 1414(d)(1)(A)(i) (defining an IEP as "a written statement"); *see also Van Duyn*, 502 F.3d at 820.  Indeed, as *Endrew F.* itself recognized, an IEP is a "plan" that requires "prospective" and "fact-intensive" judgments.  137 S. Ct. at 999.  To be sure, this is no license for a school to disregard an IEP, in whole or in part, during litigation.  But it is a recognition that a properly designed IEP will be capable of providing a free appropriate public education even in the face of a non-material implementation failure.

Another contextual clue is particularly telling.  In some implementation cases (including this one), the parties dispute the implementation of a "stay-put" IEP—that is, a child's old IEP that a school district is required to implement during the pendency of disputes over the content of a new one.  *See* 20 U.S.C. § 1415(j).  An old IEP may quite literally be impossible to fully implement in a new setting— for example, where (as here) the child has transitioned from elementary to middle school.  In view of this on-the-ground reality, other circuits have recognized that as "a child progresses from preschool to elementary school, from elementary school to middle school or from middle school to high school, the status quo no longer exists"—and as a result, when a school finds itself in this situation, "the obligation of the new district is to provide educational services that approximate the student's old IEP as closely as possible."  *John M. v. Bd. of Educ. of Evanston Twp. High Sch. Dist.*, 502 F.3d 708, 714–15 (7th Cir. 2007) (internal quotation marks and

15

citation omitted).  Whatever implementation standard the IDEA requires, it must apply to these sorts of stay-put cases.  In those cases, it would be odd—and again, often impossible—for the IDEA to demand blind compliance with an out-of-date IEP in an educational context that it was not designed for and in which it cannot be carried out in its entirety.

Given this impossibility, the alternative to a materiality standard—holding that any deviation, however minor, necessarily and conclusively amounts to an IDEA violation—is a poor fit for the IDEA and the contexts in which it operates. Adopting a hair-trigger standard for implementation cases would turn the stay-put provision into a sword rather than a shield by rendering every misstep, no matter how insignificant or unavoidable, a violation of the IDEA.  It would ignore the realities and the challenges that the IDEA was built to accommodate and fail to distinguish between schools that implement stay-put IEPs to the fullest extent possible in a new setting and schools that simply give up.  We decline to read such a counterproductive trap into the IDEA.

We thus conclude that the materiality standard—asking whether a school has failed to implement substantial or significant provisions of the child's IEP—is the appropriate test in a failure-to-implement case.[6]

---

[6] Our sister circuits have similarly concluded that materiality, not perfect-adherence, is the appropriate standard for implementation cases.  The Fifth Circuit was the first court to set out such a standard.  *See Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000). As other courts faced implementation challenges, they adopted this standard as well (sometimes with slight linguistic modifications).  *See, e.g.*, *Sumter Cty. Sch. Dist. v. Heffernan*, 642 F.3d 478, 484 (4th Cir. 2011); *A.P. v. Woodstock Bd. of Educ.*, 370 F. App'x 202, 205 (2d Cir. 2010) (unpublished); *Van Duyn*, 502 F.3d at 822 ("[A] *material* failure to implement an IEP violates the IDEA."); *see also Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1027 n.3 (8th Cir. 2003)

C.

We offer a few points on the implementation of this implementation standard. In keeping with the Supreme Court's example in *Endrew F.*, we will not attempt to map out every detail of this test. Indeed, as with the substantive standard in content cases, it is "in the nature of the Act and the standard we adopt to resist such an effort." *Endrew F.*, 137 S. Ct. at 1001. That is because every child, and every IEP, is different; whether an implementation failure is material will therefore depend on the relevant provision's place and purpose in the IEP, as well as the overall educational context that the IEP was designed for and the extent and duration of any difference between practice and plan. We are also mindful that it is not our job "to elaborate a federal common law of public education." *Id.* at 998. But we lay down a few principles to guide the analysis.

To begin, the focus in implementation cases should be on "the proportion of services mandated to those actually provided, viewed in context of the goal and import of the specific service that was withheld." *L.J.*, 850 F. Supp. 2d at 1320 (citing *Wilson v. District of Columbia*, 770 F. Supp. 2d 270, 275 (D.D.C. 2011)). The task for reviewing courts is to compare the services that are actually delivered to the services described in the IEP itself. That means that courts must consider implementation failures both quantitatively and qualitatively to determine *how much* was withheld and *how important* the withheld services were in view of the IEP as a whole.

---

(citing *Bobby R.* approvingly but noting the parties did not make a *Bobby R.*-style implementation argument).

17

A child's actual educational progress (or lack thereof) can be evidence of the materiality of an implementation failure—but it is not dispositive. *Cf. Endrew F.*, 137 S. Ct. at 998 (noting that *Rowley* "involved a child whose progress plainly demonstrated that her IEP was designed to deliver more than adequate educational benefits"). In other words, some evidence of success—or failure—in achieving certain outcomes is not outcome-determinative here any more than it is in a content case. *See id.* at 998–99. An IDEA plaintiff cannot show an implementation failure merely by pointing to a lack of educational progress. But, conversely, "the materiality standard does not require that the child suffer demonstrable educational harm in order to prevail." *Van Duyn*, 502 F.3d at 822. Still, "the child's educational progress, or lack of it, may be probative of whether there has been more than a minor shortfall in the services provided." *Id.* So, for example, "if the child is not provided the reading instruction called for and there is a shortfall in the child's reading achievement, that would certainly tend to show that the failure to implement the IEP was material," and vice versa. *Id.*

We reiterate our caution, however, that reviewing courts should not rely too heavily on actual educational progress, at least where a plaintiff has not tied the lack of progress to a specific implementation failure. It is merely one piece of evidence courts may use in assessing whether a school failed to implement substantial or significant provisions of the IEP. This is particularly true where a school implements a stay-put IEP after its newly proposed IEP has been challenged: given the circumstances, it may be unfair to judge the school based only on the output of a plan that the school itself believes is due for revision.

18

Along those same lines, we agree with the district court that schools must be afforded some measure of leeway when they implement a stay-put IEP, especially when the child has transitioned from one educational level to another after the stay-put IEP was adopted. In such a case, the school's implementation "must produce as closely as possible the overall educational experience enjoyed by the child under his previous IEP." *John M.*, 502 F.3d at 715. But reviewing courts "must recognize that educational methodologies, appropriate and even necessary in one educational environment, are not always effective in another time and place in serving a child's continuing educational needs and goals." *Id.*

This is not to say that a school may unilaterally reject or revise a child's stay-put IEP—that would defang the stay-put requirement entirely. To the contrary, the Supreme Court has made clear that the IDEA "strip[s] schools of the unilateral authority they had traditionally employed to exclude disabled students." *Honig*, 484 U.S. at 323 (emphasis omitted); *see also Sch. Comm. of the Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 373 (1985). Courts should therefore view deviations from the IEP "with a critical eye to ensure that motivations other than those compatible with the statute, such as bureaucratic inertia, are not driving the decision." *John M.*, 502 F.3d at 715. But context matters; for example, as a child moves "from elementary school to middle school or from middle school to high school," not every change necessitated by a new educational environment will necessarily violate the IDEA. *See id.* at 714–15.

We also note that courts should consider implementation as a whole in light of the IEP's overall goals. That means that reviewing courts must consider the

19

cumulative impact of multiple implementation failures when those failures, though minor in isolation, conspire to amount to something more.  In an implementation case, the question is not whether the school has materially failed to implement an individual provision in isolation, but rather whether the school has materially failed to implement the IEP as a whole.  Cumulative analysis is therefore built into the materiality standard itself.

### D.

Before applying this materiality standard to the case before us, we pause to consider at length one argument from L.J.—that the district court erred by failing to incorporate *Endrew F.* into the materiality standard.  While this case was pending before the district court—after the court had set the materiality standard as its standard of review, but before its final decision—the Supreme Court decided *Endrew F.*  And as we have said, *Endrew F.* built on the Court's earlier decision in *Rowley* and clarified that the IDEA's substantive standard was more than some courts gave it credit for.  The holding of *Endrew F.* is inherent in the standard we adopt today because, as we explain below, the IEP is a proxy for the IDEA's substantive guarantee.  But for several reasons, the analyses in content cases and implementation cases will look somewhat different.

As an initial matter, it bears repeating that both *Endrew F.* and *Rowley* were *content* cases about the substantive adequacy of a proposed IEP; this case, by contrast, is an *implementation* case in which L.J.'s mother does not question the adequacy of the underlying IEP, at least as it was drafted when L.J. was in third grade.  The ultimate question in every case is whether a school has provided a free

20

appropriate public education.  *Cf. Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1027 n.3 (8th Cir. 2003) (concluding that content and implementation analyses "safeguard the same principles").  But as we have explained, there are two ways a school might fail to do that: it might not comply with the IDEA's procedures in formulating an IEP or refuse to include provisions in a proposed IEP that are necessary to provide a free appropriate public education (content cases), or it might agree to those provisions but then fail to implement them (implementation cases).  In content cases, *Endrew F.* helps us evaluate whether the IEP is substantively adequate.  But in implementation cases, reviewing courts can presume that an unchallenged IEP, if adequately implemented, would offer a free appropriate public education.  The unchallenged IEP thus stands in as a proxy for *Endrew F.*'s substantive threshold, and a court is left only to determine whether the school delivered an education "in conformity with" the presumptively valid IEP.  With *Endrew F.*'s bar presumed to be met on paper, the materiality standard comes in to answer this latter question of conformity.

That leads us to the second point—applying *Endrew F.* directly would transform the case into a challenge to the IEP itself.  Again, that is not our task: for the purpose of a standalone implementation case, reviewing courts must assess whether the school has provided special education and related services "in conformity with" a disabled child's IEP, not whether that IEP was appropriate to begin with.  *See* 20 U.S.C. § 1401(9)(D).  Content cases involve a prospective comparison of the IEP as written to the substantive standard that the IDEA guarantees; implementation cases, by contrast, involve a retrospective comparison

21

between the education as delivered and the plan on paper. If a parent wishes to challenge the substantive adequacy of the IEP as written, content challenges are separately available and considered on their own terms. We have no grounds to raise questions about an IEP's content when the parties themselves have not done so.

Finally, the *Endrew F.* standard is particularly inapt in implementation cases where a school is operating under a stay-put IEP. Here, the school proposed a new IEP when L.J. transitioned to middle school—one that it presumably believed would comply with the IDEA's substantive requirements—but was required to implement an old IEP from elementary school while L.J.'s mother challenged the proposed replacement. *See id.* § 1415(j). Again, it would make little sense to force a school to implement an IEP it believes is outdated, and then force the school to defend that same IEP as fully appropriate for the child.

In short, the materiality standard requires schools to actually deliver on the education plans that they agree to and that the IDEA requires. And in the face of a material deviation from those plans, they will be held to account. But where the IEP itself is sufficient and any deviation from that plan is not material when considering the child's circumstances, the child's educational achievement, the proportion of services provided, and the educational context, we can conclude that a school has met its obligation to provide a free appropriate public education.

## V.

The district court, employing a standard quite similar to the materiality standard that we adopt today, undertook a thorough, detailed, and record-based

22

assessment of the evidence that addressed each alleged implementation failure. While we do not endorse every aspect of the district court's detailed analysis, a few examples suffice to demonstrate our general agreement with it.

As an initial matter, many of the ALJ's conclusions and implementation-failure findings either lack support in the record or fail to tie the alleged failure to a provision in the stay-put IEP. The extent of the shortfalls in L.J.'s speech and occupational-therapy instructional hours, for example, was relatively minor after factoring out the missed sessions attributable to L.J.'s absences. As to reading, the ALJ faulted the school for failing to implement particular curriculum recommendations from a curriculum development specialist, but no provision of the stay-put IEP required that of the school. Similarly, while the ALJ criticized the school's understanding of why L.J. behaved as he did and its data-collection practices, the district court rightly noted that the record shows that "the functions of [L.J.'s] behavior were adequately identified in the PBIP [Positive Behavior Intervention Plan]" and that "there is no requirement in the IEP, PBIP, or the governing law that the School Board hypothesize the function of every single behavior." *L.J.*, 2017 WL 6597516, at *16.[7] The same is true for issues such as a requested math referral and a technology evaluation: the ALJ concluded that the school failed in those areas, but the stay-put IEP simply did not require the services.

---

[7] The "function" of a behavior is the reason or motivation for that behavior—for example, the "function" behind screaming or throwing objects may have been to avoid a task that L.J. disliked. Expert testimony before the ALJ explained that knowing a behavior's function can help the school predict and respond to problematic behavior.

23

Other alleged implementation "failures" reflected simple disagreements between L.J.'s mother and the school about *how* to provide the services described in the IEP. The ALJ found, for example, that the school failed to provide L.J.'s mother with study guides for his classwork. But the record shows that the school did, in fact, provide study guides, and that the real dispute was over what a study guide entailed: L.J.'s mother thought that a study guide should be a synopsis of classroom lessons, while the school thought that it should be geared toward preparing L.J. for tests. And because the IEP did not define a "study guide," the ALJ was wrong to regard this parent-school dispute as an implementation failure. We decline to transform a disagreement over educational strategy into an implementation failure when the IEP did not settle that disagreement.

And as we have repeatedly emphasized, it should come as no surprise that L.J.'s stay-put IEP did not address many of these issues: it was designed for elementary school, not middle school. Indeed, many of the things that the IEP *did* address were strategies and practices that may have worked well in elementary school but made for a poor fit in the middle school setting. The stay-put IEP provided, for example, for weekly collaboration meetings involving L.J.'s mother, his general-education teacher, and other education professionals. But in middle school, L.J. had not one but six general-education teachers, making such meetings impractical and potentially unproductive; the school therefore decided to have L.J.'s general-education teachers rotate through the weekly meetings. The stay-put IEP also envisioned a "buddy system" in which L.J. would be paired with nondisabled peers to help build social skills, but common sense and record

24

evidence of L.J.'s discomfort with this practice demonstrate that forced peer-to-peer socializing is a much different matter in middle school than it is in elementary school.

What's more, many of the IEP-specified services that L.J. did miss were attributable to his refusal to attend school and other behavioral issues. And, importantly, the district court's discussion of the school's responses to L.J.'s school aversion and behavioral problems shows that L.J.'s struggles in those areas were not the result of a material IEP-implementation failure. First, school aversion: "the record demonstrates that the School Board took great lengths to offer a wide range of supports, including a full-time paraprofessional, sensory activities, dozens of accommodations, pull-out services, pragmatics training, proactive behavior strategies, and positive reinforcements, all calibrated to make L.J. feel comfortable in the middle-school setting and meet his educational needs." *Id.* at *31. This comprehensive list of services reflects the school's extensive, if unsuccessful, efforts to make L.J. feel comfortable attending school. The school also attempted to work with L.J.'s mother in order to use home-based tactics to make progress on his attendance, holding meetings and offering strategies and suggestions to address L.J.'s refusal to attend. *Id.* And early on, in the fall of L.J.'s seventh-grade year, the school developed and implemented a written plan (with help from the Center for Autism and Related Diseases) designed to address the attendance issue. It "assisted with trying to get L.J. on the bus and creating social stories for his return to school." *Id.* But between L.J.'s "frequent bouts of

25

sickness" and general "reluctance to go to school," he continued to miss day after day. *Id.*

Additionally, as the district court noted and the school emphasized at oral argument, this "is not a case where the student absented himself (i.e., skipped school) during the course of the school day." *Id.* Instead, this is a case in which— over and over again—"L.J. never made it to the front door of the school." *Id.* What's more, record evidence suggests that L.J.'s school aversion was not the result of an implementation failure. In addition to evidence of the school's "wide range of supports" and efforts to work with L.J.'s mother to address his absenteeism, the record shows that L.J. "immediately displayed a strong aversion" to the middle school setting, *id.* at *2—in sixth grade, before the time period that this case covers. In fact, as explained in the factual background, both an ALJ and the district court already determined in an earlier case that *the same IEP at issue here* was adequately implemented during L.J.'s sixth-grade year, *see L.J. v. Broward Cty. Sch. Bd.*, No. 06-61282-CIV, 2008 WL 612881 (S.D. Fla. Mar. 5, 2008)—and despite that adequate implementation, L.J. had significant attendance issues then, too. That fact, along with the other record evidence, makes it difficult to attribute L.J.'s continued school aversion in this case to an implementation failure.

And that is significant, because a conclusion that the school's IEP implementation was not the cause of L.J.'s absences undercuts many of his other arguments. As we have noted, the district court found that much of L.J.'s missed instruction—occupational therapy sessions, sensory breaks, and speech and

language services—was due to his spotty attendance, rather than to a failure on the part of the school. *L.J.*, 2017 WL 6597516, at *8–13. Missing those sessions because he was not at school is quite a different matter than missing those sessions because the school simply failed to provide them. And even for evaluating the relative success of the services L.J. *did* receive, his absenteeism makes it difficult for him to establish materiality by pointing to a lack of progress.[8] As we have explained, a lack of educational progress "may be probative" and can "tend to show" that seemingly minor implementation failures are, in fact, significant. *See Van Duyn*, 502 F.3d at 822. But that inference is much harder to make when another educational impediment—here, repeatedly missing instruction and educational services—readily explains the lack of progress.[9]

We emphasize that a child's absence from school neither relieves the school of its duties under the IDEA nor absolves the school from liability when it fails to satisfy those duties. Where a child's school refusal is attributable to the school's

---

[8] In his separate opinion, Judge Jordan concludes that the school's provision of advance lesson plans less than seven days ahead of time amounted to a material implementation failure. Separate Op. at 5–8. Judge Jordan faults the district court for its quantitative approach to analyzing this issue. *See id.* Insofar as the district court relied exclusively on a quantitative analysis, we agree: as we have made clear, the materiality standard is both quantitative *and* qualitative. But we disagree that a qualitative assessment helps L.J. in this case. In light of the wide range of services that L.J.'s stay-put IEP contemplated, the similarly wide range of services that the school provided, and L.J.'s extensive absences, we are not convinced that the school's late delivery of lesson plans shows that it *materially* failed to implement L.J.'s IEP.

[9] Amicus Council of Parent Attorneys and Advocates argues that "a school district's obligation to provide special education and related services is not limited to services delivered at school" and suggests that Broward County should have provided L.J. with educational services at his home if he would not come to school. We express no view as to whether, in a *content* dispute, a school must offer home services as part of the IEP. In this *implementation* dispute, however, no party has demonstrated how the lack of home services contravened any provision of the stay-put IEP, which outlined services to be received at school, not at home.

27

own failures to implement an IEP, the school cannot rely on that refusal as a hall pass to escape responsibility or as a license to give up.  Here, though, the evidence tells a different story.  First, L.J.'s frequent illness, his "immediate[]" aversion to his new middle school setting, and the fact that his school refusal pre-dated the years at issue in this case make it hard to draw a causal inference between any alleged implementation failures and L.J.'s absenteeism.  Second, the school did not simply sit on its hands; rather, as the district court pointed out, it offered "a wide range of supports" in an effort to address the problem.  Based on this record, we cannot fault the school for L.J.'s extensive absences.

Moving to behavioral issues, the stay-put IEP stated that L.J.'s behavioral needs should be "addressed through goals/objectives" in a behavior plan.  The school approved and implemented a PBIP in the fall of L.J.'s sixth-grade year that included observations about L.J.'s past behavior and strategies to address his future behavior, as well as a data collection and evaluation plan.  The PBIP, for example, highlighted multiple possible functions of L.J.'s problem behavior—to avoid certain tasks, to obtain sensory input, to gain attention, etc.  It specifically hypothesized these functions for particular behaviors like screaming, hitting, and throwing objects—indeed, the record shows that numerous experts agreed that the PBIP helpfully identified the functions of L.J.'s behaviors.  And it further identified certain events that might trigger such behaviors, including changes in routine, broken technology, and large groups.

Similarly, the evidence showed that the school's data-collection forms "were effective in capturing information surrounding problem behavior" and that—

28

again—although in "the ALJ's view data-collection review should have consisted of more summaries and graphs, nothing in the IEP required them." *L.J.*, 2017 WL 6597516, at \*17, 20. The record demonstrates that the school analyzed and used this data to develop intervention strategies to address L.J.'s behavioral problems. *See id.* at \*19. For example, the school district's behavioral specialist reviewed the data to look for patterns and then met with L.J.'s paraprofessional and other educators to suggest strategies for how to deal with problem behaviors in the future. *See id.* Again, the IEP says merely that L.J.'s "[b]ehavior needs" will be "addressed through goals/objectives" in a behavior plan, which the school elaborated in L.J.'s PBIP. And while the ALJ criticized the school's responses to a handful of particular incidents—saying "no" even though L.J. did not react well to negative statements, or giving L.J. candy to defuse a situation—we agree with the district court that the school's efforts on this front did not constitute a material failure.

L.J. also argues that district courts are required to assess the cumulative impact of all implementation failures and that, cumulatively, the shortfalls here amounted to a material failure. As we have explained, he is right on the first point. But he is wrong on the second. And here again, L.J.'s absenteeism is a perfect example of why. If we were convinced that his absences were the result of an implementation failure, then all the consequences flowing from them—including the missed hours of instruction, occupational and speech therapy, and the like—would, considered cumulatively, weigh in favor of finding a material implementation failure. But, as we have explained, the record suggests that the

29

school is not to blame for L.J.'s extensive absences.  On the evidence before us, we cannot say that the school violated the IDEA.

*    *    *

Because, after considering the whole record, we agree with the district court that the school did not materially fail to implement L.J.'s IEP, its judgment is **AFFIRMED.**

30

JORDAN, Circuit Judge, concurring in part and dissenting in part.

The materiality standard announced by the majority generally makes sense to me, and I agree with its adoption.  But this case, because of its many peculiarities, is not a good vehicle for trying to comprehensively lay out the parameters of that standard in challenges to the implementation of an individualized education plan (an IEP) under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq. (the IDEA).  Under the circumstances, I would say less, and not more, about the materiality standard and let it develop over time on a case-by-case basis.  On the merits, I conclude—as did the administrative law judge—that the school board materially failed to implement L.J.'s stay-put IEP in violation of the IDEA.

**I**

Let me begin with common ground.  I concur in and join Parts I, II, III, and IV.A of the majority opinion.  And, as noted, I agree with the majority's adoption of a materiality standard in IDEA cases challenging the implementation of an IEP. Although this standard defies bright-line pronouncements, materiality is a concept well-known in law and I believe it can prove workable in the IDEA context.  Indeed, there appears to be uniform agreement that materiality is the appropriate standard. Our sister circuits use a materiality standard of one form or another. *See Houston Ind. School District v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000); *Neosho R-V School District v. Clark*, 315 F.3d 1022, 1027 n.3 (8th Cir. 2003); *Couture v. Bd. of*

31

*Ed. of Albuquerque Public Schools*, 535 F.3d 1243, 1252 (10th Cir. 2008); *Van Duyn v. Baker School District*, 502 F.3d 811, 820-22 (9th Cir. 2007); *Sumter County School District v. Heffernan*, 642 F.3d 478, 484 (4th Cir. 2011).  The administrative law judge applied a materiality standard taken from *Bobby R.* and *Van Duyn*, and so did the district court.  *See* D.E. 1-2 at ¶ 349; D.E. 87 at 9-11.  L.J.'s mother does not take issue with a materiality standard, though she phrases the standard somewhat differently than the majority.  *See* Br. for Appellant at 28-31.

In a common-law system like ours, judicially-created legal standards—even those formulated to apply a statutory command—can take on a doctrinal life of their own over time.  So it matters how we phrase the materiality standard at the beginning.  Instead of asking "whether a school has failed to implement substantial or significant portions of the child's IEP," Maj. Op. at 16, I would use the Ninth Circuit's formulation: "A material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP." *Van Duyn*, 502 F.3d at 822.  *Accord Hohlman v. District of Columbia*, 153 F.Supp. 3d 386, 390 (D.D.C. 2016); *Colon-Vazquez v. Dept. of Ed. of Puerto Rico*, 46 F.Supp. 3d 132, 143-44 (D.P.R. 2014). This difference in language is subtle, but it appropriately tilts slightly in favor of the child

(for whose benefit the IDEA was enacted) and may make the difference in future cases at the margin. I therefore do not join Part IV.B of the majority opinion.[1]

I appreciate the majority's attempt in Part IV.C to provide some descriptive guidelines for application of the materiality standard. But because this case is unique in many respects, it does not strike me as a good vehicle in which to lay down general markers. First, this case involves a stay-put IEP which was developed in 2002, when L.J. was about 9 years old. Second, the school years in dispute are 2006-07 and 2007-08, meaning that the 2002 IEP was still in place 4-5 years later, when L.J. was 13-14 years old and in middle school. Third, the stay-put IEP was found to satisfy the IDEA by the district court in a separate case, and it remains the governing document despite the passage of time. Fourth, one of the major problems was L.J.'s failure to attend school on a regular basis. For example, in the 2006-07 school year L.J. missed 144 days. *See* D.E. 1-2 at ¶¶ 61, 69. These absences were so severe that the matter was referred to the state attorney's office for investigation and possible criminal prosecution for truancy, though no action was ultimately taken. *See id.* at ¶¶ 235-38. Fifth, by the time the administrative law judge was able to hold the due process hearing—which consisted of 28 witnesses, 590 exhibits, and 24 volumes of

---

[1] There does not exist a circuit split on the use of a materiality standard in IDEA implementation challenges, and I am not suggesting that we should create one. Nevertheless, this is our first published opinion on the subject, and we have a choice about what formulation of the materiality standard to embrace.

33

transcripts—and rule on the implementation claims, L.J. was about 18 years old.  By the time the district court ruled on the school district's motion for judgment on the administrative record, L.J. was about 23 years old.  And now, by the time we have ruled in this appeal, L.J. is about 26 years old.

In sum, this is a very atypical (and hopefully rare) implementation case.  Aside from the enunciation of the materiality standard, I doubt that it will prove a helpful analogy in other IDEA implementation disputes.  I would therefore let our concrete application of the standard here do the bulk of the necessary interpretive work.  *See generally* Cass R. Sunstein, One Case at a Time: Judicial Minimalism on the Supreme Court 3-6 (1999).[2]

## II

On the merits, I part company with the majority and respectfully dissent from Part V of its opinion.  I agree with the administrative law judge that the school board materially failed to implement L.J.'s stay-put IEP.  I come to this conclusion somewhat reluctantly.  I acknowledge the difficulties the school board faced in

---

[2] I am sympathetic to the majority's desire to create two distinct analytical boxes, one for challenges to the substance (i.e., content) of an IEP and the other for challenges to the implementation of an IEP.  The majority opinion does a good job in Part IV.D of explaining why it believes *Endrew F. v. Douglas County School District*, 137 S.Ct. 988 (2017), does not govern the implementation challenges box. I do not disagree with the majority, but I'm not sure we can avoid some overlap between its substantive and implementation boxes.  If, as the majority says, a child's actual educational progress (or lack thereof) is a factor in the materiality analysis, then it is difficult to keep *Endrew F.* completely out of the implementation analysis.

trying to maintain the viability of a 2002 stay-put IEP for a number of years as L.J. moved into middle school, difficulties that were compounded by L.J.'s absenteeism.

The district court believed that, for stay-put IEPs, "the materiality of the deviation is necessarily measured by reference to the feasibility and utility of its continued implementation in the new setting in light of the goals of the IEP." D.E. 87 at 10. The majority seems to agree, as it too concludes that there was no material deviation.

I'm not sure the district court's approach was the correct one. For starters, it is unclear to me how a court is supposed to measure educational "utility." In addition, the district court's reliance on "common sense," *see* D.E. 87 at 52, seems misplaced. "The recognized and defined special needs of the child and the educational goals originally set by the parents and by the professional educators must be respected. Protestations that educational methodology proven to be helpful to the child in the past are now impossible must be evaluated with a critical eye to ensure that motivations other than those compatible with the [IDEA], such as bureaucratic inertia, are not driving the decision." *John M. v. Bd. of Education of Evanston Township High School District*, 502 F.3d 708, 715 (7th Cir. 2007) (addressing a stay-put IEP).

Let's consider one of the special education services required by the IEP pursuant to the parties' settlement agreement in October of 2002 – the provision of

lesson plans and study material to L.J.'s mother 2 weeks in advance, "but no less than" 7 days in advance. D.E. 87 at 55. The administrative law judge found that the school board failed to provide L.J.'s mother with the materials as required by the IEP. The district court agreed, but explained that the administrative law judge did not determine the materiality of the deviation, and concluded based on its own analysis that the deviation was not material.

With respect to the lesson plans, the district court found that on average they were provided to L.J.'s mother approximately 4.42 days in advance. That, thought the district court, made the implementation failure non-material. *See id.* at 56. I disagree. It is not just the median average of the delay that matters, and a review of the 6-week period from September 28, 2007, to November 2, 2007, explains why the district court's singular mathematical focus was in my view incomplete.

According to the district court's own appendix, *see id.* at Appendix A, the school board was late in providing 25 of 30 lesson plans during that six-week period. In 2 of the weeks all of the lesson plans were late, and in 3 of the weeks, 4 of the 5 lesson plans were late. In total, lesson plans were late 83% of the time. And there is more. Of the 25 lesson plans that were submitted late in this 6-week period, 12 of them were provided only 3 or 4 days in advance. That means that the time required by the IEP for the lesson plans was generally cut in half for these 12 classes. So,

36

even if the focus is just on numbers, the district court's median average does not tell the whole story.

The materiality standard is both quantitative and qualitative.  *See Bobby R.*, 200 F.3d at 349 ("a party challenging the implementation of an IEP must . . . demonstrate that the school board . . . failed to implement substantial *or* significant provisions of the IEP") (emphasis added). Lesson plans were required 7 days in advance of each class so that L.J.'s mother would have sufficient time to go over each particular class with L.J.   If each lesson plan had been provided 7 days in advance of the class, then L.J.'s mother could presumably have had enough time to review the upcoming lesson herself and then schedule time to go over the lesson with L.J.  Every succeeding late lesson plan aggravated the problems created by the previous late lesson plans.  If we are using "common sense," it seems to me that all of these delays in providing the lesson plans were significant, and substantially affected (or at least potentially affected) L.J.'s ability to succeed.

Again, I acknowledge and do not wish to minimize the difficulties caused by L.J.'s absences.  Nevertheless, the school board's failure over a 6-week period to implement the IEP's requirement that lesson plans be provided at least 7 days in advance was, in my book, material.  *Compare Heffernan*, 642 F.3d at 481, 485-86 (school district which provided 7.5-10 hours a week of applied behavioral therapy for a 3-4 month period materially failed to implement IEP which called for 15 hours

37

a week of such therapy); *Van Duyn*, 502 F.3d at 823 (where IEP required that student receive 8-10 hours of math instruction per week, school board materially failed to implement that requirement by initially providing 5 hours less than required per week).

## III

Because I conclude that the school board materially failed to implement L.J.'s stay-put IEP, I would remand to the district court so that it could determine, given L.J.'s age and the passage of time, what the appropriate remedy should be.